Kip B. Shuman (CA State Bar #: 145842)
THE SHUMAN LAW FIRM
1 Montgomery Street, #1800
San Francisco, CA 94104
Telephone (303) 861-3003
Facsimile (303) 536-7849

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALBERT ZHANG, Derivatively on Behalf of Nominal Defendant SELLAS LIFE SCIENCES GROUP, INC. f/k/a GALENA BIOPHARMA, INC.<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM L. ASHTON, RICHARD CHIN, IRVING M. EINHORN, STEPHEN GALLIKER, SANFORD J. HILLSBERG, RUDOLPH NISI, MARK W. SCHWARTZ, JANE WASMAN, FABIO LOPEZ, STEPHEN F. GHIGLIERI, DAVID A. SCHEINBERG, ROBERT L. VAN NOSTRAND, JOHN VARIAN, and ANGELOS M. STERGIOU,<br><br>Defendants.<br><br>SELLAS LIFE SCIENCES GROUP, INC. f/k/a GALENA BIOPHARMA, INC.<br><br>Nominal Defendant. | Case No.<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

# REDACTED VERSION

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Albert Zhang ("Plaintiff"), by and through his undersigned attorneys, derivatively on behalf of nominal defendant Sellas Life Sciences Group, Inc. f/k/a Galena Biopharma, Inc. ("Galena" or the "Company"), submits this Verified Shareholder Derivative Complaint against the directors and officers named herein.[1]

## NATURE OF THE ACTION

1.      Plaintiff's allegations are based upon personal knowledge as to himself, and upon information and belief developed from the investigation and analysis of his counsel, which includes, among other things, public filings by Galena with the U.S. Securities and Exchange Commission ("SEC"), as well as, press releases, news reports, analyst reports and other information available in the public domain, including publicly available filings in lawsuits, transcripts of lawsuits, and matters of public record. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

2.      Plaintiff brings this action derivatively for the benefit of nominal defendant Galena against certain members of its Board of Directors (the "Board") and senior executive officers seeking to remedy these defendants' breaches of fiduciary duties and unjust enrichment from approximately January 1, 2014 to the present (the "Relevant Period").

3.      The Individual Defendants (as defined herein below) knowingly oversaw and participated in a scheme of illegal marketing and rebate/promotion practices which resulted in illegal and unsustainable sales relating to their product, Abstral (a fentanyl-based sublingual tablet), and compounded by false and/or misleading statements about the Company's business, operations and prospects to its shareholders and the public. Moreover, the Individual

_____

[1]    As the Company only recently changed its name to Sellas following a merger and all internal documents refer to Galena, Plaintiff refers to the Company throughout as "Galena".

2

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Defendants' sales and marketing strategy was deliberately manipulated to deemphasize marketing to Abstral's FDA-approved target patients (breakthrough cancer pain) to generic pain patients (i.e., off-label).

4.     Certain of the Individual Defendants knowingly entered into an unethical and illegal relationship with two physicians, Dr. John Patrick Couch ("Couch") and Dr. Xiulu Ruan ("Ruan") to sell massive quantities of Abstral. Drs. Couch and Ruan were sentenced to 240 months and 252 months, respectively, in federal prison for running a massive illegal pill mill in Mobile, Alabama where they dispensed thousands of prescriptions for Abstral. With regard to Abstral, evidence from the trial showed that Dr. Ruan and Dr. Couch purchased approximately $1.6 million worth of stock in Galena and sought to manipulate the stock price by driving up Abstral sales via prescribing Abstral for shockingly large numbers of "patients" at their pain clinic. From the third quarter of 2013 through the 2014, Dr. Ruan and Dr. Couch were the number one and two prescribers of Abstral in the entire United States. During this same time period, nearly one out of every three Abstral prescriptions written in the U.S. were written by either Dr. Ruan or Dr. Couch. The Company's documents confirm that the Board knew full well the impact that Drs. Ruan and Couch were having on the Company's sales of Abstral yet persisted in strengthening the Company's relationship with their illegal medical practice.

5.     Following the convictions of Dr. Ruan and Dr. Couch, Galena announced that it had agreed to pay $7.55 million to settle a criminal investigation by the Department of Justice over allegations made in a whistleblower suit that the company gave kickbacks to doctors to boost prescriptions for Abstral. ████████████████████████████
████████████████████████████████████████████████████
████████████████████

6.     ████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████ These Individual Defendants,

3

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

purportedly after "a thorough review of available alternatives, and extensive diligence and negotiation with Sellas [Life Sciences Group, Ltd. ("Sellas"), […] unanimously approved to enter into a definitive merger agreement with Sellas."[2] Under the terms of the merger agreement, existing Sellas shareholders would receive newly-issued shares of Galena common stock. On a pro forma basis, assuming completion of the proposed merger, Galena stock and warrant holders would own approximately 32.5%, and Sellas shareholders would own about 67.5% of the combined company.

7.     While the pre-merger Galena Board did not receive any monetary compensation in connection with the Merger, they received something even more valuable from Sellas and certain of the Sellas officers and directors. The Company's Form S-4 explicitly provides that the pre-Merger Galena Board members and the post-Merger Galena Board members would "jointly and severally, indemnify and hold harmless" each for any and all claims relating to their service as directors of Galena. This indemnification agreement was not limited to claims arising out of the Merger itself, but by its terms is unlimited and would apply to claims relating to the pre-Merger Board's illegal conduct regarding Abstral. In short, via the Merger, the pre-Merger Board members insulated themselves from all liability to the Company. This violated both the pre- and post-Merger Board's fiduciary duties to Galena.

8.     Plaintiff brings this action to recover for the Company the damages caused by the foregoing improper illegal acts and to compel the Individual Defendants (as defined herein below) to disgorge to the Company all compensation received during which they participated in and oversaw this illegal scheme.

---

[2]   Plaintiff refers herein to Galena as "the Company" despite it being renamed "Sellas Life Sciences Group, Ltd." Following the merger described herein. References to "Sellas" refer to the pre-Merger Sellas entity.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that plaintiff and defendants (as defined herein below) are citizens of different states and the matter in controversy exceeds the jurisdictional amount of $75,000, exclusive of interest and costs. In addition, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because nominal defendant Galena is headquartered in this District. Moreover, a substantial portion of the occurrences complained of herein and one or more of the defendants either reside in, or maintain offices in, this District.

## PARTIES

### Plaintiff

11.      Plaintiff Albert Zhang is a shareholder of Galena, was a shareholder of Galena at the time of the wrongdoing alleged herein and has been a shareholder of Galena continuously since December 20, 2013. Plaintiff is a citizen of the People's Republic of China.

### Nominal Defendant

12.      Nominal defendant Sellas Life Sciences Group, Ltd. f/k/a Galena Biopharma, Inc. is incorporated under the laws of Delaware. Galena's principal executive office where the majority of the conduct herein occurred at 2000 Crow Canyon Pl #380, San Ramon, CA. Following the merger with Sellas, the Company purports to maintain executive offices at 315 Madison Avenue, 4th Floor, New York, NY 10017. According to its public filings, Galena is a biopharmaceutical company.

**The Individual Defendants**

13.     Defendant Sanford J. Hillsberg ("Hillsberg") was the Chairman of the Board from 2007 to Dec. 29, 2017. Upon information and belief, Hillsberg is a citizen of California. Galena's website provides the following biographical information regarding defendant Hillsberg:

> Mr. Hillsberg has been the Chairman of our board of directors since 2007. Mr. Hillsberg has been an attorney with TroyGould PC since 1976 and is a member of the firm's Management Committee. Mr. Hillsberg is a founder and former director of ImmunoCellular Therapeutics, Ltd., a publicly-held biopharmaceutical company formed to develop cellular therapies, including dendritic cell-based vaccines for the treatment of brain and other cancers. Mr. Hillsberg has also served as a director of Tempra Technology, Inc., a thermal research and development company, since 1997. Mr. Hillsberg served as a director and Secretary of Duska Therapeutics, Inc., a publicly-held biopharmaceutical company, and its predecessor company from 1999 until January 2006. He previously served as a director and Vice President of Medco Research, Inc., a then publicly-held pharmaceutical company. Mr. Hillsberg is a member of the Board of Governors of Cedars-Sinai Medical Center and has also previously served as a Commissioner of the Quality and Productivity Commission of the City of Los Angeles. Mr. Hillsberg holds a B.A. degree from the University of Pennsylvania and a J.D. degree from Harvard Law School.

14.     Defendant Richard Chin ("Chin") served as a director of Galena from 2009 to Dec. 29, 2017. Upon information and belief, Chin is a citizen of California. Galena's website provides the following biographical information regarding defendant Chin:

> Dr. Chin has been one of our directors since 2009. Dr. Chin is currently the Chief Executive Officer of Institute for OneWorld Health, a nonprofit pharmaceutical company developing drugs for neglected diseases in developing countries. Prior to joining iOWH, Dr. Chin served as the President and CEO of OXiGENE a NASDAQ-listed company developing vascular targeting drugs for oncology and ophthalmology. Previously, Dr. Chin served as Senior Vice President and Head of Global Development for Elan Corporation, plc from May 2005 until 2006 and served as Senior Vice President and Head of Global Medical Affairs of Elan from June 2004 until May 2005. As Senior Vice President and Head of Global Development for Elan Corporation, Dr. Chin had worldwide responsibility for Clinical Development, Regulatory, Biostatistics, CMC, QA/Compliance, Safety and Medical Affairs. Prior to June 2004, Dr. Chin served in various clinical and scientific roles of increasing responsibility for Genentech, Inc. between March 1999 and June 2004, and ultimately served as the company's Group Director and Head of Clinical Research, Biotherapeutics Unit. While at

Genentech, Dr. Chin oversaw approximately 50% of its Phase I through Phase IV clinical trials. He played leadership roles on multiple projects, including Genentech's anti-VEGF antibody, Lucentis, and served as Team Leader for Avastin® Non-Oncology Teams. Dr. Chin began his career in pharmaceuticals in July 1997 at Procter and Gamble Pharmaceuticals where he served as Associate Medical Director. Dr. Chin holds a Medical Degree from Harvard Medical School. He received a Masters Degree and Bachelor of Arts degree in Law with honors from Oxford University, England under a Rhodes Scholarship. He graduated with a Bachelor of Arts in Biology, magna cum laude, from Harvard University. Dr. Chin is a Diplomate, American Board of Internal Medicine and is licensed to practice medicine in California. Dr. Chin currently serves on the Board of Directors of Genmedica, located in Barcelona, Spain.

15.     Defendant Stephen S. Galliker ("Galliker") served as a director of Galena from 2007 to Dec. 29, 2017. Upon information and belief, Galliker is a citizen of Florida. Galena's website provides the following biographical information regarding defendant Galliker:

Mr. Galliker has been one of our directors since 2007. Mr. Galliker served as the Executive Vice President, Finance and Administration, and Chief Financial Officer of Dyax Corp., a biopharmaceutical company focused on advancing novel biotherapeutics for unmet medical needs, from 1999 until his retirement in July 2008. From 1996 to 1999, Mr. Galliker was the Chief Financial Officer of Excel Switching Corporation, a developer and manufacturer of open switching platforms for telecommunications networks, and was Excel's Vice President, Finance and Administration from 1997 to 1999. From 1992 to 1996, Mr. Galliker was employed by Ultracision, Inc., a developer and manufacturer of ultrasonically powered surgical instruments, where he served as Chief Financial Officer and Vice President of Finance until 1995, when he became Ultracision's Chief Operating Officer. Mr. Galliker is also a director of Osteotech, Inc., a medical device company. Mr. Galliker is a Certified Public Accountant and received a B.S. from Georgetown University and an M.B.A. from the University of Chicago.

16.     Defendant Rudolph Nisi ("Nisi") served as a director of Galena from 2009 to Dec. 29, 2017. Upon information and belief, Nisi is a citizen of New York. Galena's website provides the following biographical information regarding defendant Nisi:

Dr. Nisi has been one of our directors since 2009. Dr. Nisi has held various positions at New York Westchester Square Medical Center. In addition to having been on the Active Staff in Internal Medicine/Cardiology since 1963, Dr. Nisi is also Director of Medicine since 1975, Chief of Cardiology since 1975, Chairman of Medical Critical Care Unit since 1975, President of the Medical Board from 1977 to 1978, Chairman of the Board of Trustees since

7
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1983 and from 1976 to 1978, Chairman of the ER Committee since 1984, and Vice-President of Medical Affairs since 1993. Dr. Nisi is a founder and the Chairman of the Board of Trustees of Medco Research, a publically held pharmaceutical company that was acquired by King Pharmaceuticals after successfully developing and marketing Adenocard, a drug that is used in most ambulances for approximately six years. Dr. Nisi has also served as an Attending Physician at New York Hospital, a Clinical Assistant Professor of Medicine at Cornell University Medical College and an Assistant Dean at Weill Medical College of Cornell University. Dr. Nisi has also served as a director of Tempra Technology, Inc., a thermal research and development company, since 1997 and on the boards of Touchtone HMO and New York Presbyterian Hospital. Dr. Nisi holds a B.S. degree from Fordham University and a Doctor of Medicine degree from the University of Rome Medical School in Rome, Italy and is a fellow in the American College of Cardiology.

17.     Defendant William L. Ashton ("Ashton") served as a director of Galena from April 2013 to Dec. 29, 2017. Upon information and belief, Ashton is a citizen of Pennsylvania. Galena's website provides the following biographical information regarding defendant Ashton:

William L. Ashton [65] was appointed as a director on April 26, 2013. Mr. Ashton has been a principal at Harrison Consulting Group, Inc., a privately-held biopharmaceutical consulting rm, since 2013. Mr. Ashton was the founding Dean of the Mayes College of Healthcare Business and Policy from 2005 to 2008 and was the Senior Vice President of External Affairs and an Assistant Professor at University of the Sciences in Philadelphia, Pennsylvania until 2013. From 1989 to 2005, Mr. Ashton held a number of positions at Amgen Inc., a biotechnology company, including Vice President of U.S. Sales and Vice President of Commercial and Government Affairs. Mr. Ashton currently serves on the boards of Recro Pharma, Inc., a publicly-held global pharmaceutical company, the Academy of Notre Dame, and Loyola University. Previously, he served on the boards of Sucampo Pharmaceuticals, Inc., the National Osteoporosis Foundation, and the Friends of the National Library of Medicine at the National Institutes of Health. Mr. Ashton holds a B.S., Education, from the California University of Pennsylvania and an M.A., Education, from the University of Pittsburgh.

18.     Defendant Irving M. Einhorn ("Einhorn") has served as a director of Galena from March 2014 to Dec. 29, 2017. Upon information and belief, Einhorn is a citizen of California. Galena's website provides the following biographical information regarding defendant Einhorn:

Irving M. Einhorn [74] was appointed as a director on March 14, 2014. Mr. Einhorn started his career in 1972 as a SEC Staff attorney. He rose to increasingly

more responsible positions culminating in his appointment as Regional Administrator of the Commission's Los Angeles Regional Office where he was responsible for overseeing in excess of 100 staff members whose function was to implement the SEC's regulatory and law enforcement mandates principally in the Western United States. Subsequent to leaving the SEC in 1989, Mr. Einhorn has engaged in the private practice of law focused exclusively on federal, state and self- regulatory organization securities enforcement and securities compliance matters.

19.     Defendant Mark W. Schwartz ("Schwartz") served as a director of Galena between September 16, 2014, until his resignation on January 31, 2017. He also was the Company's President and Chief Executive Officer ("CEO") from August 21, 2014 until his resignation on January 31, 2017. Upon information and belief, defendant Schwartz is a citizen of Oregon.

20.     Defendant Jane Wasman ("Wasman") has served as a director of Galena since Dec. 29, 2017, following the completion of the Merger. Upon information and belief, Wasman is a citizen of New York. Galena's website provides the following biographical information regarding defendant Wasman:

Ms. Wasman has been President, International & General Counsel and Corporate Secretary of Acorda Therapeutics, Inc., or Acorda, a publicly traded biopharmaceutical company, since October 2012, managing its International, Legal, Quality, IP and Compliance functions. From January 2012 until October 2012, she was Acorda's Chief, Strategic Development, General Counsel and Corporate Secretary, and from May 2004 until January 2012, she was Acorda's Executive Vice President, General Counsel and Corporate Secretary. Before joining Acorda, Ms. Wasman was with Schering-Plough Corporation, a global pharmaceutical company, for over eight years, holding various U.S. and international leadership positions, including Staff Vice President and Associate General Counsel. Ms. Wasman earned a J.D. from Harvard Law School and her undergraduate degree magna cum laude from Princeton University. She has been a member of the board of directors and of the executive committee of the board of the New York Biotechnology Association since 2007.

21.     Defendant Fabio Lopez ("Lopez") has served as a director of Galena since Dec. 29, 2017, following the completion of the Merger. Upon information and belief, Lopez is a citizen of Switzerland. Galena's website provides the following biographical information regarding defendant Lopez:

9

Mr. López is co-founder & Chief Executive Officer of Equilibria Capital Management Limited since inception in 2011. Fabio also serves on the Investment Committee and as a Senior Advisor to Stoneweg Spanish Real Estate funds in Geneva. Fabio has 20 years of investment and industry management experience. Prior to Equilibria, he spent seven years leading a private investment holding company, Flagoser, with investments in infrastructure, industry, real estate and financial assets. During his tenure, Fabio served on the board of directors and audit committee of ENCE Energia y Celulosa, a listed paper company as well as several boards of directors in privately held real estate and infrastructure companies. He began his career at Morgan Stanley's Investment Banking division in London in 1997. Mr. López holds a B.S. in Business Administration from Universidad Pontificia Comillas ICADE in Madrid, Spain.

22.   Defendant Stephen F. Ghiglieri ("Ghiglieri") is Galena's Chief Executive Officer and joined the Company in November 2016. He has served as a director of Galena since Dec. 29, 2017, following the completion of the Merger. Upon information and belief, Ghiglieri is a citizen of New York. Galena's website provides the following biographical information regarding defendant Ghiglieri:

Mr. Ghiglieri is currently serving as Galena's Interim Chief Executive Officer and Chief Financial Officer. Mr. Ghiglieri joined Galena in November 2016 as Chief Financial Officer. In February 2017, his responsibilities increased as he was appointed Interim Chief Executive Officer. Prior to Galena, Mr. Ghiglieri served as Chief Financial Officer of MedData Inc., a private equity backed healthcare services company that was sold to Mednax, a publicly traded national medical group from 2013 until April 2016. Previously, he spent nearly 10 years at NeurogesX from October 2003 until June 2013, ending his tenure as its Executive Vice President, Chief Operating Officer and Chief Financial Officer. Prior to that, he served as the Chief Financial Officer of Hansen Medical, Inc., a medical device company. He also held senior level finance positions at two other healthcare companies: Oacis Healthcare Systems, Inc., and Oclassen Pharmaceuticals, Inc. Additionally, Mr. Ghiglieri was also the Chief Financial Officer and Corporate Secretary for two technology software companies: Avolent, Inc., and Andromedia, Inc. Mr. Ghiglieri began his career as an audit manager of PricewaterhouseCoopers, LLP. He received a B.S. in Business Administration from California State University, Hayward where he graduated Magna Cum Laude. Mr. Ghiglieri is also a Certified Public Accountant (inactive).

23.   Defendant David A. Scheinberg ("Scheinberg") has served as a director of Galena since Dec. 29, 2017, following the completion of the Merger. Upon information and belief, Scheinberg is a citizen of New York. Galena's website provides the following biographical information regarding defendant Scheinberg:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Dr. Scheinberg is currently Vincent Astor Chair, and Chairman, Molecular Pharmacology, Sloan Kettering Institute. He also founded and chairs the Center for Experimental Therapeutics at MSK, where he spearheaded the discovery and early clinical development of GPS, and founded and was chair of the Nanotechnology Center from 2010 to 2014. He is additionally Professor of Medicine and Pharmacology and co-chair of the Pharmacology graduate program at the Weill-Cornell University Medical College and Professor in the Gerstner-Sloan Kettering Graduate School at MSK. Dr. Scheinberg is also an attending physician in the Department of Medicine, Leukemia Service and Hematology Laboratory Service/Department of Clinical Laboratories at Memorial Hospital. Dr. Scheinberg is an advisor to charitable foundations and cancer centers and sits on the board of directors of Progenics Pharmaceuticals, Inc. (NASDAQ: PGNX), a biotechnology company. Dr. Scheinberg has also served on SELLAS' Scientific Advisory Board since 2015. From 2010-2016 he served on the board of directors of Contrafect Corporation, a publicly traded clinical-stage biotechnology company. Dr. Scheinberg holds an M.D. and a Ph.D. in Pharmacology and Experimental Therapeutics from the Johns Hopkins University School of Medicine. Dr. Scheinberg earned his undergraduate degree in Biology from Cornell University.

24.     Defendant Robert L. Van Nostrand ("Van Nostrand") has served as a director of Galena since Dec. 29, 2017, following the completion of the Merger. Upon information and belief, Van Nostrand is a citizen of New York. Galena's website provides the following biographical information regarding defendant Van Nostrand:

Mr. Van Nostrand is currently on the Board of Directors of Achillion Pharmaceuticals, Inc. (NASDAQ: ACHN), a biotechnology company, Enumeral Biomedical Corporation (OTCMKTS: ENUM), a biotechnology company, Intra-Cellular Therapies, Inc. (NASDAQ: ITCI), a biopharmaceutical company, Yield10 Bioscience, Inc. (NASDAQ: YTEN), formerly Metabolix, Inc., a bio agricultural company, and the Biomedical Research Alliance of New York, a private company providing clinical trial services. Mr. Van Nostrand was Executive Vice President and Chief Financial Officer of Aureon Laboratories, Inc., a pathology life science company, from January 2010 to July 2010. Prior to joining Aureon Laboratories, Mr. Van Nostrand served as Executive Vice President and Chief Financial Officer of AGI Dermatics, a private biotechnology company, from July 2007 to September 2008 when the company was acquired. Between 1986 and 2007, Mr. Van Nostrand held various executive and other management positions, including Chief Compliance Officer and Chief Financial Officer, at OSI Therapeutics, Inc., or OSI. Prior to joining OSI, Mr. Van Nostrand served in a managerial position with the accounting firm, Touche Ross & Co., currently Deloitte. Mr. Van Nostrand is also on the board of New York Biotechnology Association and was the former chairman, and is on the Foundation Board of Farmingdale University. Mr. Van Nostrand holds a B.S. in Accounting from Long Island University, New York and completed advanced management studies at the Wharton School of the University of Pennsylvania. He is a Certified Public Accountant.

25.     Defendant John Varian ("Varian") has served as a director of Galena since Dec. 29, 2017, following the completion of the Merger. Upon information and belief, Varian is a citizen of California. Galena's website provides the following biographical information regarding defendant Varian:

> Mr. Varian served as Chief Executive Officer of XOMA Corporation, or XOMA, from August 2011 through December 2016 and served as a member of the Board of Directors of XOMA from December 2008 through May 2017. Mr. Varian currently serves as a member of Versartis, Inc.'s (NASDAQ: VSAR) Board of Directors, a position he has held since March 2014. Mr. Varian previously served as Chief Operating Officer of ARYx Therapeutics, Inc. from December 2003 through August 2011. Beginning in May 2000, Mr. Varian was Chief Financial Officer of Genset S.A. in Paris France, where he was a key member of the team negotiating Genset's sale to Serono S.A. in 2002. From 1998 to 2000, Mr. Varian served as Senior Vice President, Finance and Administration of Elan Pharmaceuticals, Inc., joining the company as part of its acquisition of Neurex Corporation. Prior to the acquisition, he served as Neurex Corporation's Chief Financial Officer from 1997 until 1998. From 1991 until 1997, Mr. Varian served as the VP Finance and Chief Financial Officer of Anergen Inc. Mr. Varian was an Audit Principal / Senior Manager at Ernst & Young LLP from 1987 until 1991 where he focused on life sciences. Mr. Varian was also a founding committee member of Bay Bio and a former chairman of the Association of Bioscience Financial Officers International Conference. Mr. Varian holds a B.B.A. from Western Michigan University. SELLAS believes Mr. Varian's significant experience working with biopharmaceutical companies, with a specific focus on financing, corporate financial management and related matters, qualifies him to serve on the continuing company's board of directors.

26.     Defendant Angelos M. Stergiou ("Stergiou") has served as a director of Galena since Dec. 29, 2017, following the completion of the Merger. Upon information and belief, Stergiou is a citizen of New York. Galena's website provides the following biographical information regarding defendant Stergiou:

> Dr. Stergiou has served as SELLAS' Chief Executive Officer since founding SELLAS in 2012 and has also served as a director since that time, both as Chairman from 2012 to July 2016, and as Vice Chairman since July 2016. Dr. Stergiou also co-founded Genesis Life Sciences, Ltd. (now Genesis Research), a boutique health economics and pricing-reimbursement and health access company. Dr. Stergiou served on the joint steering and oversight committee of PAION AG with Forest Labs in 2003-2004 as it relates to the desmoteplase technology and its clinical development program, had a senior management role, Vice President and Head of Drug Development at Accentia Biopharmaceuticals, Inc. from 2004 to 2008 and also served in the same capacity as well as Chief Medical Officer at its subsidiary Biovest International, Inc. during the same time. While at Biovest International, Inc., Dr. Stergiou led the Phase 3 development of

a therapeutic cancer vaccine, BiovaxID, which was presented at the American Society of Clinical Oncology plenary session in 2009. Dr. Stergiou holds an M.D. from the U.S. American Institute of Medicine and a Sc.D. h.c. from Kentucky Wesleyan College and received his undergraduate degree in pre-medicine, biology and chemistry from Kentucky Wesleyan College. Dr. Stergiou is a member of the Board of Trustees at Kentucky Wesleyan College, a Fellow of the Royal Society of Medicine, an active member of the World Medical Association, and a member of the American Academy of Physicians in Clinical Research and the Association of Clinical Research Professionals.

27.     Defendants Hillsberg, Ashton, Chin, Galliker, Einhorn, Nisi, Schwartz, Wasman, Lopez, Ghiglieri, Scheinberg, Van Nostrand, Varian and Stergiou are referred to collectively herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

28.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

   a. exercise good faith to ensure that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to

provide the highest quality performance of its business;

b.  exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.  refrain from wasting the Company's assets;

d.  refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

e.  properly disclose all material information regarding the Company, required by applicable state and federal laws and/or their relevant duties, to the Company's shareholders.

30.     The Individual Defendants, and all employees of the Company, were required to comply with the Company's Code of Ethics and Conduct (the "Code of Ethics"), which was in effect at the time of the Individual Defendants' misconduct. The Code of Ethics states, in relevant part:

> It is the policy of Galena Biopharma, Inc. (the "Company") to conduct business in compliance with all applicable laws, rules and regulations. Further, it is our policy to conduct business with integrity. We make this commitment to our customers, to our partners, to our shareholders, to our community, to those government agencies that regulate the Company, and to ourselves.

> Each of the Company employee, officer and director, as well as agents and contractors working on behalf of the Company, must work to comply with the policies set forth in this Code of Ethics and Conduct (the "Code"). All employees, officers and directors should review this Code or summary materials issued in conjunction with the Code, and make sure that these policies guide their actions. Because of the complex and changing nature of legal requirements, each member of the Company must be constantly vigilant to ensure that their conduct complies with the Code. If any employee, officer or director becomes aware of an issue of legal compliance which is not adequately addressed in this Code, you should notify your supervisor or the Chief Financial Officer. The text of the Company's Corporate Code of Ethics and Conduct can also be found at www.galenabiopharma.com.

The Company takes compliance with laws, regulations, rules and the Code seriously. Any violation of such will result in disciplinary action. Such action may include an oral or written warning, disciplinary probation, suspension, reduction in salary, demotion, or dismissal from employment. These disciplinary actions also may apply to an employee's supervisor who directs or approves the employee's improper actions or is aware of those actions, but does not act appropriately to correct them or fails to exercise appropriate supervision.

\*\*\*

**2. Compliance with the Law**

The Company seeks to comply with all applicable government laws, rules and regulations. We need the cooperation of all employees, officers and directors to do so and to bring lapses or violations to light. While some regulatory schemes may not carry criminal penalties, they control the licenses and certifications that allow the Company to conduct its business. The Company's continued ability to operate depends upon your help for compliance.

Some of the regulatory programs, which employees may deal with in the course of their duties, include, but are not limited to, the following:

- Labor laws.
- Occupational Safety and Health regulation.
- Building, safety, and fire codes.
- Wage and Hour Laws.
- Laws and regulations pertaining to the development, manufacture and sale of biopharmaceutical products, including, without limitation, the U. S. Food, Drug & Cosmetic Act and all applicable U.S. Food and Drug Administration regulations and guidance documents relating to the manufacture, promotion and sale of biopharmaceutical products.

The Compliance Officer can provide employees with information on these rules, and can direct questions or concerns to the proper person.

\*\*\*

**5. Special Ethical Obligations for Employees with Public Reporting Responsibilities**

As a public company, we are also committed to carrying out all continuing disclosure obligations in a full, fair, accurate, timely and understandable manner. Depending on their position with the Company, employees, officers or directors may be called upon to provide information to assure that the Company's public reports are complete, fair and understandable. The Company expects all of its personnel to take this responsibility very seriously and to provide prompt and accurate answers to inquiries related to the Company's public disclosure requirements.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Because of this special role, all employees, officers, and directors are bound by the following Code of Ethics, and by accepting this Code of Ethics, each agrees, as applicable, that he or she will:

- Act with honesty and integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships.
- Provide information that is accurate, complete, objective, relevant, timely and understandable to ensure full, fair, accurate, timely, and understandable disclosure in reports and documents that [Company] files with, or submits to, government agencies and in other public communications.
- Comply with rules and regulations of federal, state, provincial and local governments, and other appropriate private and public regulatory agencies.
- Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing one's independent judgment to be subordinated.
- Respect the confidentiality of information acquired in the course of one's work except when authorized or otherwise legally obligated to disclose.
- Confidential information acquired in the course of one's work will not be used for personal advantage.
- Share knowledge and maintain skills important and relevant to shareholder's needs.
- Proactively promote and be an example of ethical behavior as a responsible partner among peers, in the work environment and the community.
- Achieve responsible use of and control over all assets and resources employed or entrusted.

The Accounting Department bears a special responsibility for promoting integrity throughout the organization, with responsibilities to shareholders both inside and outside of the Company. The Chief Executive Officer, the Chief Financial Officer and other Accounting Department personnel have a special role both to adhere to these principles themselves and also to ensure that a culture exists throughout the company as a whole that ensures the fair and timely reporting of the Company's financial results and condition.

Employees, officers and directors should promptly report to the Compliance Officer and/or the Chairman of the Audit Committee any conduct that the individual believes to be a violation of law or business ethics or of any provision of the Code, including any transaction or relationship that reasonably could be expected to give rise to such a conflict.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(Emphasis added)[3]

# FACTUAL ALLEGATIONS

## The Company's Abstral Product Is a Fentanyl-Based Drug

31.     On October 3, 2013, the Company announced the product launch of Abstral (fentanyl) Sublingual Tablets, a drug designed to address breakthrough cancer pain. The Abstral formulation purportedly delivered micronized fentanyl in a convenient sublingual tablet which was designed to dissolve under the tongue in seconds and provide relief from breakthrough pain within minutes.

32.     Fentanyl is an incredibly potent and dangerous drug. Experts argue that Fentanyl has made America's opioid epidemic, already the deadliest drug overdose crisis in US history, even deadlier. In 2015, more than 52,000 people died of drug overdoses. In 2016, the total rose to more than 64,000. A spike in fentanyl overdose deaths was perhaps the key contributor: Overdose deaths linked to non-synthetic opioids like fentanyl jumped from nearly 10,000 in 2015 to nearly 20,000 in 2016 — surpassing traditional painkillers and heroin for the first time.

33.     Fentanyl, as a drug that's relatively easy to produce for a better, cheaper high per dose than heroin, has become the natural destination for traffickers and users who want the strongest products. Fentanyl is an extremely potent synthetic opioid that has been traditionally used medically to relieve pain since the 1960s. Since fentanyl's introduction it has been adopted as a spray, patch, lollipop, and other mediums for pain relief. Abstral's medium is as an under the tongue quick dissolving lossenge.

34.     Unlike heroin, fentanyl and its analogs can be made fairly easily in a lab. That makes fentanyl far cheaper to produce, without the hassle of growing opium poppy and then

---

[3]     Available: [https://s21.q4cdn.com/197231374/files/doc_downloads/gov_doc/CodeEthics.pdf]; Accessed October 9, 2017.

converting the poppy into morphine and then into heroin. Over the past few years, fentanyl and its analogs have appeared in the streets, often laced into the illicit heroin supply. Law enforcement officials believe that most of this fentanyl comes from labs in China, where it's produced without the supervision of US drug regulators and law enforcement officials who would very much like the drug to stop going to illegal recreational uses.

35.     Generally, fentanyl is described as anywhere from 40 to 100 times more potent than morphine and several times more potent than heroin. One way to understand just how potent fentanyl can be: It often negates naloxone, an antidote used to reverse opioid overdoses. While first responders can typically use one dose of naloxone to save someone's life if she's overdosing on painkillers or heroin, they've found that multiple doses of naloxone can be needed to fight back a fentanyl overdose. In short, fentanyl (and Abstral) are dangerous narcotics that require extreme care and oversight by the patient, the patient's doctor and the company selling the drug to ensure that the drug is not abused.

**The Individual Defendants Cause Galena to Issue False and Misleading Statements and Fail to Disclose their Illegal Marketing Scheme**

36.     ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████     ████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

_____

[4] ██████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ As the Department of Justice release states, this situation was serious: "As alleged, top executives of Insys Therapeutics, Inc. paid kickbacks and committed fraud to sell a highly potent and addictive opioid that can lead to abuse and life threatening respiratory depression," said Harold H. Shaw, Special Agent in Charge of the Federal Bureau of Investigation, Boston Field Division.[5] "In doing so, they contributed to the growing opioid epidemic and placed profit before patient safety. *Id.* These indictments reflect the steadfast commitment of the FBI and our law enforcement partners to confront the opioid epidemic impacting our communities, while bringing to justice those who seek to profit from fraud or other criminal acts." *Id.* INSYS's Chief Executive Officer, and several Vice Presidents were among those indicted. A full description of the situation is unfortunately relevant to the situation here given that both INSYS and Galena are facing investigations of illegal kickback/marketing schemes related to fentanyl-based drugs:

**Pharmaceutical Executives Charged in Racketeering Scheme**

BOSTON – Several pharmaceutical executives and managers, formerly employed by Insys Therapeutics, Inc., were arrested today on charges that they led a nationwide conspiracy to bribe medical practitioners to unnecessarily prescribe a fentanyl-based pain medication and defraud healthcare insurers.

The indictment alleges that Michael L. Babich, 40, of Scottsdale, Ariz., the former CEO and President of the company; Alec Burlakoff, 42, of Charlotte, N.C., former Vice President of Sales; Richard M. Simon, 46, of Seal Beach, Calif., former National Director of Sales; former Regional Sales Directors, Sunrise Lee,

---

[5]    "Pharmaceutical Executives Charged in Racketeering Scam." Dec. 8, 2016. Available: https://www.justice.gov/usao-ma/pr/pharmaceutical-executives-charged-racketeering-scheme

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

36, of Bryant City, Mich. and Joseph A. Rowan, 43, of Panama City, Fla.; and former Vice President of Managed Markets, Michael J. Gurry, 53, of Scottsdale, Ariz., conspired to bribe practitioners in various states, many of whom operated pain clinics, in order to get them to prescribe a fentanyl-based pain medication. The medication, called "Subsys," is a powerful narcotic intended to treat cancer patients suffering intense episodes of breakthrough pain.  In exchange for bribes and kickbacks, the practitioners wrote large numbers of prescriptions for the patients, most of whom were not diagnosed with cancer.

The indictment also alleges that the now former corporate executives charged in the case conspired to mislead and defraud health insurance providers who were reluctant to approve payment for the drug when it was prescribed for non-cancer patients.  They achieved this goal by setting up the "reimbursement unit" which was dedicated to obtaining prior authorization directly from insurers and pharmacy benefit managers.

"Patient safety is paramount and prescriptions for these highly addictive drugs, especially Fentanyl, which is among the most potent and addictive opioids, should be prescribed without the influence of corporate money," said United States Attorney Carmen M. Ortiz.  "I hope that today's charges send a clear message that we will continue to attack the opioid epidemic from all angles, whether it is corporate greed or street level dealing."

"As alleged, top executives of Insys Therapeutics, Inc. paid kickbacks and committed fraud to sell a highly potent and addictive opioid that can lead to abuse and life threatening respiratory depression," said Harold H. Shaw, Special Agent in Charge of the Federal Bureau of Investigation, Boston Field Division.  "In doing so, they contributed to the growing opioid epidemic and placed profit before patient safety.  These indictments reflect the steadfast commitment of the FBI and our law enforcement partners to confront the opioid epidemic impacting our communities, while bringing to justice those who seek to profit from fraud or other criminal acts."

"We take allegations of paying kickbacks to physicians in exchange for prescribing medically unnecessary painkillers extremely seriously," said Special Agent in Charge Phillip Coyne of the U.S. Department of Health and Human Services, Office of the Inspector General. "Working closely with our law enforcement partners, we will continue to protect the health of Medicare beneficiaries and the integrity of the nation's healthcare system."

The defendants were arrested this morning in their respective states and will appear in U.S. District Court in Boston at a later date.  Babich is charged with conspiracy to commit racketeering, conspiracy to commit wire and mail fraud and conspiracy to violate the Anti-Kickback Law; Burlakoff, Simon, Lee and Rowan are charged with RICO conspiracy, mail fraud conspiracy and conspiracy to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

violate the Anti-Kickback Law; Gurry is charged with RICO conspiracy and wire fraud conspiracy.

The indictment also alleges that the conspiracy to bribe practitioners and to defraud insurers generated substantial profits for the defendants, their company, and for the co-conspirator practitioners.

"Causing the unnecessary use of opioids by current and retired U.S. military service members shows disregard for their health and disrespect for their service to our country," said Special Agent in Charge Craig Rupert of the Defense Criminal Investigative Service (DCIS), Northeast Field Office.   "DCIS will continue to partner with the DOJ and our fellow law enforcement agencies to address conduct such as this and protect America's Warfighters."

"EBSA is very pleased to had the opportunity work collaboratively with our law enforcement partners in this important investigation," said Susan A. Hensley, Regional Director of the U.S. Department of Labor, Employee Benefits Security Administration, Boston Regional Office.

"I commend the exceptional work performed by our criminal investigators and their law enforcement partners," said Scott Rezendes, Special Agent in Charge of the U.S. Office of Personnel Management, Office of Inspector General, Office of Investigations.   "It is utterly unacceptable to risk the safety and well-being of patients in order to increase profits.  This office will continue to vigorously pursue any and all cases that may jeopardize the health of Federal employees, annuitants, and their families."

"U.S. Postal Inspection Service is committed to protecting the nation's mail system from criminal misuse," said Shelly Binkowski, Inspector in Charge of the U.S. Postal Inspection Service.  "This investigation is an excellent example of a partnership between government agencies working together to dismantle prescription drug practices that directly contribute to the ongoing opioid abuse epidemic."

"The United States Postal Service, Office of Inspector General will continue to vigorously investigate companies that engage in improper relationships with medical providers for the purpose of increasing market share as alleged in this case," said Eileen Neff, Special Agent in Charge of the U.S. Postal Service Office of Inspector General.  "We thank our law enforcement partners for their help in preventing this type of fraud against the healthcare programs of the American public and the Postal Service."

"Misrepresenting a patient's diagnoses and using kickbacks to prescribing doctors to inflate drug sales is fraudulent activity," said Donna L. Neves, Special Agent in Charge of the U.S. Department of Veterans Affairs, Office of Inspector General, Northeast Field Office.  "Targeting veterans' dependents using CHAMPVA with

these type techniques is unacceptable.  We are pleased to have contributed to this outstanding multi-agency criminal investigation and will continue to pursue allegations of health care fraud that put our veterans and their families at risk."

On the charges of conspiracy to commit RICO and conspiracy to commit mail and wire fraud, the charging statute provides a sentence of no greater than 20 years in prison, three years of supervised release and a fine of $250,000, or twice the amount of pecuniary gain or loss.  On the counts of conspiracy to violate the Anti-Kickback Law, the charging statute provides a sentence of up to five years in prison, three years of supervised release and a $25,000 fine.  Actual sentences for federal crimes are typically less than the maximum penalties.  Sentences are imposed by a federal district court judge based upon the U.S. Sentencing Guidelines and other statutory factors.

The investigation was conducted by a team that included the FBI; HHS-OIG; FDA Office of Criminal Investigations; the Defense Criminal Investigative Service; the Drug Enforcement Administration; the Department of Labor, Employee Benefits Security Administration; the Office of Personnel Management; the U.S. Postal Inspection Service; the U.S. Postal Service Office of Inspector General; and the Department of Veterans Affairs.  The U.S. Attorney would like to acknowledge the outstanding cooperation and assistance of the U.S. Attorney's Offices around the country engaged in parallel investigations, including the District of Connecticut; the Eastern District of Michigan; the Southern District of New York; and the Southern District of Alabama.  The efforts of the Central District of California and the Civil Fraud Section of the Department of Justice are also greatly appreciated.

Assistant U.S. Attorneys K. Nathaniel Yeager, Chief of Ortiz's Health Care Fraud Unit, and Susan M. Poswistilo, of Ortiz' Civil Division, are prosecuting the case.[6]

40.    On August 11, 2014, the Individual Defendants caused the Company to issue a press release entitled "Galena Biopharma Reports Second Quarter 2014 Results." Therein, the Company, in relevant part, stated:

PORTLAND, Ore., Aug. 11, 2014 (GLOBE NEWSWIRE) -- Galena Biopharma,

Inc. (Nasdaq: GALE), a biopharmaceutical company developing and commercializing innovative, targeted oncology treatments that address major

---

[6]    "Pharmaceutical Executives Charged in Racketeering Scam." Dec. 8, 2016. Available: https://www.justice.gov/usao-ma/pr/pharmaceutical-executives-charged-racketeering-scheme

unmet medical needs to advance cancer care, today reported its financial results for the quarter ended June 30, 2014 and provided a business update.

"With the recent acquisition of our second approved product, Zuplenz, Galena now has two commercial products and three clinical assets in development, providing our shareholders a stratified and diversified pipeline as we look to enhance cancer care and treat its often debilitating side-effects," said Mark J. Ahn, Ph.D., President and Chief Executive Officer. "We are excited for the second half of the year as we continue to advance all of our programs. Our two, key expected milestones in clinical development are completion of enrollment activities in our international, Phase 3 NeuVax PRESENT study, and the initiation of the Phase 2 clinical trial with GALE-401. Commercially, we continue to gain traction with Abstral, and we have begun preparations for the launch of Zuplenz in early 2015."

* * *

Second Quarter 2014 Financial Highlights

Net revenue for the three months ended June 30, 2014 was $2.3 million and $4.5 million for the first half of 2014, compared to no net revenue for the six months ended June 30, 2013. Cost of revenue and gross margin were $0.3 million and $2.0 million, respectively, for the three months ended June 30, 2014. Of the net revenue, approximately $0.9 million was attributable to an order from one of the principal customers of Galena. The timing and amount of the order could cause a corresponding reduction in orders from this customer, and in related revenue, in the third quarter of 2014.

Operating loss for the three months ended June 30, 2014 was $15.8 million, including $1.5 million in stock-based compensation charges, compared to $11.8 million, including $1.7 million in stock-based compensation charges, for the three months ended March 31, 2014, and $8.0 million, including $0.5 million in stock-based compensation charges, for the three months ended June 30, 2013.

Galena also incurs non-cash income and expense related to changes in the fair value estimates of the Company's warrant liabilities. Non-cash expense related to the change in warrant values for the three months ended June 30, 2014 was $3.4 million compared to non-cash income of $9.8 million for the three months ended March 31, 2014, and non-cash expense of $0.5 million for the three months ended June 30, 2013.

Net loss for the three months ended June 30, 2014 was $19.9 million, or $0.17 per basic and diluted share, compared to a net loss of $2.5 million, or $0.02 per basic and diluted share, for the three months ended March 31, 2014, and a net loss of $9.6 million, or $0.11 per basic and diluted share, for the three months ended June 30, 2013.

As of June 30, 2014, Galena had cash and cash equivalents of $39.2 million, compared with $47.8 million as of December 31, 2013.

41.     On the same day, August 11, 2014, the Individual Defendants caused the Company to issue its quarterly report on form 10-Q with the SEC. The 10-Q reaffirmed the Company's financial results announced in the press release issued the same day.

42.     ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████

43.     ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

44.     On November 3, 2014, the Individual Defendants caused the Company to issue a press release entitled "Galena Biopharma Reports Third Quarter 2014 Results." Therein, the Company, in relevant part, stated:

PORTLAND, Ore., Nov. 3, 2014 (GLOBE NEWSWIRE) -- Galena Biopharma, Inc. (Nasdaq:GALE), a biopharmaceutical company developing and commercializing innovative, targeted oncology treatments that address major unmet medical needs to advance cancer care, today reported its financial results for the quarter ended September 30, 2014 and provided a business update.

"The company continues to make excellent progress on our clinical programs, and we continue to build our commercial franchise," said Mark W. Schwartz, Ph.D., President and Chief Executive Officer. "I believe we have turned the corner on the corporate challenges we faced this year, and we are fully focused on the progress of NeuVax™ and its portfolio of clinical trials, our development pipeline and our commercial programs including the upcoming launch of Zuplenz®. Over the next six months, we will report results from the ongoing trials with GALE-301 and GALE-401, and our NeuVax platform will expand with the initiation of two new
trials plus the completion of enrollment in our pivotal, Phase 3 PRESENT study. The launch of Zuplenz in Q1 2015 enhances our commercialization efforts and we believe we will see significant sales growth for that business line in 2015."

* * *

*Financial Highlights*

Net revenue for the third quarter of 2014 was $1.6 million compared to $1.2 million for the third quarter of 2013, an increase of 25%. Net revenue for the nine months ended September 30, 2014 was $6.1 million. The third quarter of 2013 was the first quarter that the company generated net revenue.

Operating loss for the three months ended September 30, 2014 was $13.2 million, including $1.3 million in stock-based compensation charges, compared to $6.9 million, including $0.5 million in stock-based compensation charges, for the three months ended September 30, 2013.

Galena also incurs non-cash income and expense related to changes in the fair value estimates of the Company's warrant liabilities. Non-cash income related to the change in warrant values for the three months ended September 30, 2014 was $6.7 million compared to non-cash expense of $1.6 million for the three months ended September 30, 2013.

Net loss for the three months ended September 30, 2014 was $6.2 million, or $0.05 per basic and diluted share, compared to a net loss of $9.3 million, or $0.11 per basic and diluted share, for the three months ended September 30, 2013.

As of September 30, 2014, Galena had cash and cash equivalents of $24.6 million, compared with $47.8 million as of December 31, 2013.

45.     On November 5, 2014, the Individual Defendants caused the Company to issue its quarterly report on form 10-Q with the SEC. The 10-Q reaffirmed the Company's financial results announced in the press release issued on November 3, 2014.

46. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████

| | | | |
|---|---|---|---|
| ████ | ████ | ██████ | ████ |
| ████ | ██ | ██████ | ████ |
| | ██ | ██████ | ██████ |
| ████ | ██ | ██████ | ██████ |
| | ██ | ██████ | ██████ |
| | ██ | ██████ | ██████ |
| | ██ | ██████ | ██████ |
| █████ | | ██████ | ██████ |

47. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



48.     On March 5, 2015, the Individual Defendants caused the Company to issue a press release entitled "Galena Biopharma Reports Fourth Quarter and Year End 2014 Financial Results." Therein, the Company, in relevant part, stated:

PORTLAND, Ore., March 5, 2015 (GLOBE NEWSWIRE) -- Galena Biopharma, Inc. (Nasdaq: GALE), a biopharmaceutical company developing and commercializing innovative, targeted oncology therapeutics that address major medical needs across the full spectrum of cancer care, today reported its financial results for the quarter and year ended December 31, 2014 and provided a business update.

"The advances we made across all of our programs in 2014 were substantial, and I am looking forward to a very positive and productive 2015 for Galena," said Mark W. Schwartz, Ph.D., President and Chief Executive Officer. "Galena is unique among oncology-focused biopharmaceutical companies of our size in that we possess an extensive development pipeline complemented by an established commercial enterprise, providing the company with multiple opportunities to create value in both the near and longer terms. The Phase 3 PRESENT clinical trial for NeuVax remains the centerpiece of our clinical strategy, and we are very pleased to have recently reported the enrollment of the 700th patient into the study, and look forward to completing enrollment near the end of the quarter. Looking ahead, we expect to reach our event-driven, interim analysis at the end of 2015/early 2016 timeframe with a top-line data readout anticipated in 2018."

Dr. Schwartz continued, "As we continue to advance the PRESENT clinical trial, we expect to reach a number of key milestones with our additional immunotherapy programs, including readouts on our NeuVax combination trials with Herceptin® and top line data from our GALE-301 clinical trial. Additionally, we anticipate the commercial arm of our business to continue to grow revenue, while enhancing our relationships in the oncology community as

28
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

our development pipeline advances. As reported today, we recorded our strongest Abstral quarter to date, hitting above the middle of our guidance range for the year, and with the addition of our second commercial product in Zuplenz, we expect to nearly double our overall commercial sales in 2015."

Dr. Schwartz concluded, "Our commercial and clinical teams have done a tremendous job over the past year to advance our multiple programs. As I assess our company, I am not only excited about the next 6-12 months, but for the long-term prospects of Galena Biopharma."

\* \* \*

FINANCIAL HIGHLIGHTS AND GUIDANCE

"2014 was a productive year for Galena with significant advances in our pipeline and commercial operations. We are pleased to report $9.3 million net revenue for Abstral which is consistent with our guidance of $8 to $10 million for 2014. We expect net revenue to increase throughout 2015 based on increased Abstral demand combined with the launch of our second commercial product, Zuplenz. We reiterate confidence in our net revenue guidance of $15-$18 million for 2015 for our commercial operations," added Ryan Dunlap, CPA, Vice President and Chief Financial Officer.

The company recognizes revenue from the sale of Abstral to wholesale pharmaceutical distributors, net of product-related discounts, allowances, product returns, rebates, chargebacks, and patient assistance benefits, as applicable. Net revenue was $3.2 million in the fourth quarter of 2014 and $9.3 million for the year ended December 31, 2014, compared to $1.3 million and $2.5 million, respectively, for the same periods of 2013.

Operating loss for the fourth quarter of 2014 was $11.4 million, including $1.0 million in stock based compensation, and $52.2 million, including $5.4 million in stock-based compensation charges, for the year ended December 31, 2014, compared to $12.4 million, including $1.6 million in stock-based compensation, and $33.8 million, including $2.9 million in stock based compensation, respectively, for the same periods in 2013. The increase in net operating loss year-over-year is primarily the result of our increased activity and enrollment in our Phase 3 PRESENT trial for NeuVax, our investigator sponsored trials for NeuVax, and our Phase 2 trial for GALE-401, as well as increased selling and marketing expenses associated with the growth of our commercial activities.

Other income or expense includes non-cash charges related to changes in the fair value estimates of the company's warrant liabilities and contingent purchase price liability, and the realized gain from the sale of marketable securities. The non-cash benefit related to the changes in values of our warrant and contingent purchase price liabilities for the fourth of 2014 was $3.6 million and $16.7

million for the year ended December 2014, versus non-cash charges of $37.2 million and $44.9 million, respectively, for the same periods in 2013, respectively.

Net loss for the fourth quarter of 2014 was $8.0 million, including $3.6 million in a non-cash benefit described above, and a net loss of $36.6 million, including a $16.7 million non-cash benefit, for the year ended December 31, 2014, or $0.06 and $0.31 per basic and diluted share, respectively. Net loss for the fourth quarter of 2013 was $48.5 million, including $34.7 million of non-cash charges described above, and a net loss of $76.7 million, including $41.0 million of non-cash charges for the year ended December 31, 2013 or $0.46 and $0.85 per basic and diluted share, respectively.

On November 20, 2014 we announced the execution of a purchase agreement for up to $55.0 million with Lincoln Park Capital Fund ("LPC"). During the fourth quarter of 2014, we utilized the LPC agreement, as well as the At Market Issuance Sale Agreement ("ATM") announced in 2013, to raise approximately $10.7 million through the sale of 6.6 million common shares, at a weighted average discount to market of approximately 8%. No warrants were issued in connection with these financing arrangements.

As of December 31, 2014, Galena had cash and cash equivalents of $23.7 million, compared with $47.8 million as of December 31, 2013, and $24.7 million at the end of the third quarter of 2014. The $1.0 million change in cash during the fourth quarter represents $10.7 million in cash used for operating activities, and $0.1 million in cash used in investing activities, and $0.9 million in debt service payments, offset by $10.7 million in cash raised using the aforementioned LPC agreement and ATM facilities.

COMMERCIAL HIGHLIGHTS

***Achieved Abstral® (fentanyl) Sublingual Tablets net revenue of $9.3 million, within the 2014 guidance of $8-$10 million for the first full year of sales.*** Abstral is FDA approved, and is a sublingual (under the tongue) fentanyl tablet indicated only for the management of breakthrough pain in patients with cancer, 18 years of age and older, who are already receiving, and who are tolerant to, opioid therapy for their persistent baseline cancer pain.

49.     On the same day, March 5, 2015, the Individual Defendants caused the Company to file its annual report on form 10-K with the SEC. The 2015 10-K was signed by defendants Hillsberg, Ashton, Chin, Einhorn, Galliker, Nisi, and Schwartz and reaffirmed the  Company's financial results announced in the press release issued on the same day.

50. 

51.     On May 7, 2015, the Individual Defendants caused the Company to issue a press release entitled "Galena Biopharma  Reports First Quarter 2015 Financial Results." Therein, the Company, in relevant part, stated:

PORTLAND, Ore., May 7, 2015 (GLOBE NEWSWIRE) -- Galena Biopharma, Inc. (Nasdaq: GALE), a biopharmaceutical company developing and commercializing innovative, targeted oncology therapeutics that address major medical needs across the full spectrum of cancer care, today reported its financial results for the quarter ended March 31, 2015 and provided a business update.

"We achieved two critical milestones thus far this year with completion of enrollment in our Phase 3 PRESENT trial and the closing of a public offering to solidify our balance sheet," said Mark W. Schwartz, Ph.D., President and Chief Executive Officer. "Together, these events demonstrate Galena's near-term and longer-range value proposition as we continue to advance the Company's development and commercial operations to capitalize on significant treatment opportunities within the oncology setting."

Dr. Schwartz continued, "Completing enrollment and over-enrolling our PRESENT trial is a major accomplishment for Galena. We are now focused on treating and monitoring the 758 patients in this Phase 3 trial as we progress towards our event-driven, interim analysis at the end of this year or in the first quarter of 2016. The ongoing advancement of our NeuVax and GALE-301

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

programs showcase the significant potential of our cancer immunotherapy programs that are designed to harness the power of the immune system to prevent a patient's cancer from returning. To do this effectively, we are treating women in the adjuvant setting whose immune systems have returned to a healthy status after having received their cancer treatments, giving NeuVax and GALE-301 the best opportunity to make a difference."

Dr. Schwartz concluded, "Dovetailing the clinical successes during the quarter, the financing that we secured in March was an important achievement for Galena as it provides us the flexibility to advance our development programs and to strengthen our commercial efforts. Our immunotherapy platform has multiple clinical trials ongoing and we look forward to key data readouts from these trials over the next year. Meanwhile, on the commercial front, Abstral sales remain on target, our oncology presence continues to grow, and we reiterate our full year guidance of $15-$18 million for 2015. Additionally, we are now preparing to launch Zuplenz in July, adding a second, supportive care commercial product to our oncology-focused sales portfolio. In total, we have established a strong foundation with our development programs supported by our commercial franchise, and we remain committed to the growth of our company."

* * *

FINANCIAL HIGHLIGHTS AND GUIDANCE

We recognize revenue from the sale of Abstral to wholesale pharmaceutical distributors, net of product-related discounts, allowances, product returns, rebates, chargebacks, and patient assistance benefits, as applicable. Net revenue was $2.8 million in the first quarter of 2015, a 28% increase compared to $2.2 million for the same period a year ago.

Operating loss for the first quarter of 2015 was $11.1 million, including $0.6 million in stock based compensation, compared to an operating loss of $11.8 million, including $1.7 million in stock-based compensation for the same period in 2014. The decrease in net operating loss year-over-year is primarily the result of the completion of enrollment in our Phase 3 PRESENT trial for NeuVax, as well as the decrease in stock based compensation.

Other income or expenses include non-cash charges related to changes in the fair value estimates of the company's warrant liabilities and contingent purchase price liability, and the realized gain from the sale of marketable securities. The non-cash benefit related to the changes in the value of our warrant liability for the first quarter of 2015 was $1.2 million for the three months ended March 31, 2015, versus a non-cash benefit of $9.8 million for the same period in 2014, respectively.

Net loss for the first quarter of 2015 was $10.5 million, including $1.2 million in a non-cash benefit described above, or $0.08 per basic and diluted share. Net loss for the first quarter of 2014 was $2.5 million, including a $9.8 million non-cash benefit described above, or $0.02 per basic and diluted share.

On March 18, 2015, we announced the closing of our underwritten public offering of 24,358,974 shares of common stock and 12,179,487 warrants to purchase our common stock at an exercise price of $2.08. The underwriters also exercised their over-allotment option to purchase warrants to purchase an aggregate of 1,826,923 shares of our common stock. On April 10, 2015 the underwriters exercised their option to purchase an additional 3,653,846 shares of common stock for additional net proceeds of $5.4 million. The total net proceeds to us from the March 2015 offering were approximately $40.8 million. Also, during January and February of 2015 we raised $6.6 million under the Lincoln Park and ATM agreements, resulting in a total cash raise of $47.4 million during the first quarter of 2015 and through today.

As of March 31, 2015, Galena had cash and cash equivalents of $52.9 million, compared with $23.7 million as of December 31, 2014. The $29.2 million increase in cash during the first quarter represents the aforementioned cash raised from issuance of common stock (excluding the April overallotment exercise), partially offset by $11.6 million used in operating activities, $0.5 million milestone payment for Zuplenz, and $0.9 million in debt service payments.

52.     On the same day, May 7, 2015, the Individual Defendants caused the Company to issue its quarterly report on form 10-Q with the SEC. The 10-Q reaffirmed the Company's financial results announced in the press release issued on the same day.

53.     ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████      ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

————————————————

[7] ██████████████████████████████████████████████

██████

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

[8]

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

54.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT



55.     On August 6, 2015, the Individual Defendants caused the Company to issue a press release entitled "Galena Biopharma Reports Second Quarter 2015 Financial Results." Therein, the Company, in relevant part, stated:

PORTLAND, Ore., Aug. 6, 2015 (GLOBE NEWSWIRE) -- Galena Biopharma, Inc. (NASDAQ: GALE), a biopharmaceutical company developing and commercializing innovative, targeted oncology therapeutics that address major medical needs across the full spectrum of cancer care, today reported its financial results for the quarter ended June 30, 2015 and provided a business update.

"With our balance sheet strengthened, we made significant clinical progress in the second quarter as we reached a critical milestone with completion of enrollment in our Phase 3 PRESENT trial and had promising data readouts from two of our Phase 2 clinical trials with GALE-301 and GALE-401," said Mark W. Schwartz, Ph.D., President and Chief Executive Officer. "Our cancer immunotherapy programs continue to advance with our multiple NeuVax programs as well as with GALE-301. Our early Phase 2a data with GALE-301 in ovarian and endometrial cancer was positive, and we will present a more mature data set at the European Society for Medical Oncology Congress in September. In addition, we presented preliminary Phase 2 data on our hematology asset, GALE-401, at the European Hematology Association Congress demonstrating encouraging efficacy and safety data. We expect to present final data from the GALE-401 Phase 2 trial later this year."

Dr. Schwartz added, "On the commercial side of our business, last week we launched Zuplenz within our existing commercial infrastructure to treat patients

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

suffering from nausea and vomiting as a result of their chemotherapy, radiation and surgical treatments. And, today we reported improved Abstral sales quarter over quarter resulting in our strongest net revenue quarter to date. Based on current projections, we anticipate that we will come in closer to the lower end of our guidance range, at around $15 million for the year."

\* \* \*

FINANCIAL HIGHLIGHTS AND GUIDANCE

We recognize revenue from the sale of Abstral to wholesale pharmaceutical distributors, net of product-related discounts, allowances, product returns, rebates, chargebacks, and patient assistance benefits, as applicable. Because the launch of Zuplenz occurred in July, there is no revenue recorded for Zuplenz through Q2, 2015, and all revenue to date is from Abstral sales. Net revenue was $3.4 million in the second quarter of 2015, a 48% increase compared to $2.3 million reported for the same period in 2014. Net revenue was $6.1 million in the first half of 2015, a 36% increase compared to $4.5 million reported for the same period in 2014.

Operating loss for the second quarter of 2015 was $11.3 million, including $0.6 million in stock based compensation, compared to an operating loss of $15.8 million, including $1.5 million in stock-based compensation for the same period last year. Operating loss for the first half of 2015 was $22.4 million, including $1.3 million in stock based compensation, compared to an operating loss of $27.6 million, including $3.2 million in stock-based compensation for the same period in 2014. The decrease in net operating loss year-over-year is primarily the result of the completion of enrollment in our Phase 3 PRESENT trial for NeuVax, as well as the decrease in stock based compensation and professional fees associated with ongoing legal proceedings.

Non-operating income or expenses include non-cash charges related to changes in the fair value estimates of the company's warrant liabilities, contingent purchase price liability, and interest expense. The non-cash expense related to the changes in the value of our warrant liability for the second quarter of 2015 was $4.3 million versus a non-cash expense of $3.4 million for the same period in 2014, respectively. The non-cash expense related to the changes in the value of our warrant liability for the first half of 2015 was $3.1 million versus a non-cash benefit of $6.4 million for the same period in 2014, respectively.

Net loss for the second quarter of 2015 was $15.7 million, including $4.3 million in a non-cash expense described above, or $0.10 per basic and diluted share. Net loss for the second quarter of 2014 was $19.9 million, including a $3.4 million non-cash expense described above, or $0.17 per basic and diluted share. The lower net loss this quarter compared to the same quarter last year is a function of

the lower operating loss, partially offset by the increase in the non-cash loss on the change in our warrant values, as described above. Net loss for the first half of 2015 was $26.2 million, including $3.1 million in a non-cash expense described above, or $0.18 per basic and diluted share. Net loss for the first half of 2014 was $22.5 million, including a $6.4 million non-cash benefit described above, or $0.19 per basic and diluted share. The higher net loss through the first two quarters of this year compared to the same period last year is a function of the lower operating loss, which was more than offset by the non-cash loss on the change in our warrant values this year, compared to a non-cash gain last year, as described above.

As of June 30, 2015, Galena had cash and cash equivalents of $45.3 million, compared with $23.7 million as of December 31, 2014. The $21.6 million increase in cash during the first half of 2015 represents $47.4 million raised from issuance of common stock, partially offset by $23.4 million used in operating activities, a $0.5 million milestone payment for Zuplenz, and $1.9 million in debt service payments.

56. On the same day, August 6, 2015, the Individual Defendants caused the Company to issue its quarterly report on form 10-Q with the SEC. The 10-Q reaffirmed the Company's financial results announced in the press release issued on the same day.

57. On August 6, 2015, the Individual Defendants caused the Company to issue a press release entitled "Galena Biopharma Reports Second Quarter 2015 Financial Results." Therein, the Company, in relevant part, stated:

PORTLAND, Ore., Aug. 6, 2015 (GLOBE NEWSWIRE) -- Galena Biopharma, Inc. (NASDAQ: GALE), a biopharmaceutical company developing and commercializing innovative, targeted oncology therapeutics that address major medical needs across the full spectrum of cancer care, today reported its financial results for the quarter ended June 30, 2015 and provided a business update.

"With our balance sheet strengthened, we made significant clinical progress in the second quarter as we reached a critical milestone with completion of enrollment in our Phase 3 PRESENT trial and had promising data readouts from two of our Phase 2 clinical trials with GALE-301 and GALE-401," said Mark W. Schwartz, Ph.D., President and Chief Executive Officer. "Our cancer immunotherapy programs continue to advance with our multiple NeuVax programs as well as with GALE-301. Our early Phase 2a data with GALE-301 in ovarian and endometrial cancer was positive, and we will present a more mature data set at the European Society for Medical Oncology Congress in September. In addition, we presented preliminary Phase 2 data on our hematology asset, GALE-401, at the European Hematology Association Congress demonstrating encouraging efficacy and safety

data. We expect to present final data from the GALE-401 Phase 2 trial later this year."

Dr. Schwartz added, "On the commercial side of our business, last week we launched Zuplenz within our existing commercial infrastructure to treat patients suffering from nausea and vomiting as a result of their chemotherapy, radiation and surgical treatments. And, today we reported improved Abstral sales quarter over quarter resulting in our strongest net revenue quarter to date. Based on current projections, we anticipate that we will come in closer to the lower end of our guidance range, at around $15 million for the year."

\* \* \*

FINANCIAL HIGHLIGHTS AND GUIDANCE

We recognize revenue from the sale of Abstral to wholesale pharmaceutical distributors, net of product-related discounts, allowances, product returns, rebates, chargebacks, and patient assistance benefits, as applicable. Because the launch of Zuplenz occurred in July, there is no revenue recorded for Zuplenz through Q2, 2015, and all revenue to date is from Abstral sales. Net revenue was $3.4 million in the second quarter of 2015, a 48% increase compared to $2.3 million reported for the same period in 2014. Net revenue was $6.1 million in the first half of 2015, a 36% increase compared to $4.5 million reported for the same period in 2014. Operating loss for the second quarter of 2015 was $11.3 million, including $0.6 million in stock based compensation, compared to an operating loss of $15.8 million, including $1.5 million in stock-based compensation for the same period last year. Operating loss for the first half of 2015 was $22.4 million, including $1.3 million in stock based compensation, compared to an operating loss of $27.6 million, including $3.2 million in stock-based compensation for the same period in 2014. The decrease in net operating loss year-over-year is primarily the result of the completion of enrollment in our Phase 3 PRESENT trial for NeuVax, as well as the decrease in stock based compensation and professional fees associated with ongoing legal proceedings.

Non-operating income or expenses include non-cash charges related to changes in the fair value estimates of the company's warrant liabilities, contingent purchase price liability, and interest expense. The non-cash expense related to the changes in the value of our warrant liability for the second quarter of 2015 was $4.3 million versus a non-cash expense of $3.4 million for the same period in 2014, respectively. The non-cash expense related to the changes in the value of our warrant liability for the first half of 2015 was $3.1 million versus a non-cash benefit of $6.4 million for the same period in 2014, respectively.

Net loss for the second quarter of 2015 was $15.7 million, including $4.3 million in a non-cash expense described above, or $0.10 per basic and diluted share. Net loss for the second quarter of 2014 was $19.9 million, including a $3.4 million

non-cash expense described above, or $0.17 per basic and diluted share. The lower net loss this quarter compared to the same quarter last year is a function of the lower operating loss, partially offset by the increase in the non-cash loss on the change in our warrant values, as described above. Net loss for the first half of 2015 was $26.2 million, including $3.1 million in a non-cash expense described above, or $0.18 per basic and diluted share. Net loss for the first half of 2014 was $22.5 million, including a $6.4 million non-cash benefit described above, or $0.19 per basic and diluted share. The higher net loss through the first two quarters of this year compared to the same period last year is a function of the lower operating loss, which was more than offset by the non-cash loss on the change in our warrant values this year, compared to a non-cash gain last year, as described above.

As of June 30, 2015, Galena had cash and cash equivalents of $45.3 million, compared with $23.7 million as of December 31, 2014. The $21.6 million increase in cash during the first half of 2015 represents $47.4 million raised from issuance of common stock, partially offset by $23.4 million used in operating activities, a $0.5 million milestone payment for Zuplenz, and $1.9 million in debt service payments.

58.     On the same day, August 6, 2015, the Company filed its quarterly report on form 10-Q with the SEC. The 10-Q reaffirmed  the Company's financial results announced in the press release issued on the same day.

59.     Up to this point, there has yet to be a single disclosure from the Company about their illegal rebate/marketing scheme or their massive illegal sales/rebate arrangement with the criminally convicted Drs. Ruan and Couch.

**The Company Announces It Will Divest Abstral**

60.     On November 9, 2015, the Individual Defendants caused the Company to announce that it had decided to divest its commercial  business, which included Abstral. As such, the Company's commercial business activities were  classified as "discontinued operations," and Galena stated that it anticipated exiting the  commercial business by the end of the first quarter of 2016.  In whole, Galena stated:

SAN RAMON, Calif., Nov. 9, 2015 (GLOBE NEWSWIRE) -- Galena Biopharma, Inc. (NASDAQ: GALE), a biopharmaceutical company committed to the development and commercialization of targeted oncology therapeutics that

address major unmet medical needs, today reported its financial results for the quarter ended September 30, 2015. The Company also announced it has completed a strategic review of the organization and has elected to focus its efforts and financial resources exclusively on the continued development of its high value oncology pipeline led by NeuVax™ (nelipepimut-S), and divest its commercial business which consists of Abstral® (fentanyl) Sublingual Tablets and Zuplenz® (ondansetron) Oral Soluble Film.

For financial and accounting purposes, Galena has classified its commercial business activities as discontinued operations effective as of the third quarter, and the Company removes all revenue and expense guidance as it relates to its commercial business. Galena has engaged a financial advisor to provide strategic advice and a process to divest the commercial business, and the Company anticipates exiting the commercial business by the end of the first quarter of next year. Providers and patients will have ongoing access to both drugs until we have transitioned out of the business.

"Led by NeuVax, Galena has an extremely robust clinical development pipeline targeting areas of high unmet medical need that represent significant high-value market opportunities for the company," said Mark W. Schwartz, Ph.D., President & CEO. "Over the past year, we have met several key development milestones while also expanding our clinical pipeline to four assets in eight ongoing or planned clinical trials. Our strategy going forward is to advance these programs while exploring additional indications in the immuno-oncology field where our assets can potentially make a difference in the treatment of cancer or in addressing the rapidly growing patient population of cancer survivors by harnessing the power of the immune system to prevent their cancer recurrence."

Dr. Schwartz continued, "When I assumed the position of President and CEO of Galena, I, along with our executive team, began a careful examination of our operations and assets to determine the optimal strategy for Galena that would enable the greatest opportunity for growth, while maximizing shareholder value. As a result of this analysis and review by our Board of Directors, we have concluded that it is in the best interest of our patients, our shareholders, and the long-term success of our company to focus our energy and resources exclusively on our clinical development programs. Since acquiring the products we have significantly grown the sales of Abstral and successfully launched Zuplenz, and I believe that each has strong commercial potential and offers significant benefits to their respective patient populations. However, the foundation of Galena has always been our cancer immunotherapy programs, which are now rapidly advancing towards several key inflection points. Therefore, we believe it is important for Galena to focus on our core expertise and the successful advancement of our late and mid stage clinical pipeline. We appreciate the dedication and hard work of the commercial team as we transition out of the commercial business and are extremely grateful for all of their efforts."

Dr. Schwartz concluded, "For both patients and shareholders of Galena, there is a much greater opportunity to generate value if we dedicate all of our resources to our clinical programs, and we are eager to move the company in this new direction. As part of this renewed focus, we have officially consolidated at our new headquarters in San Ramon, California. We look forward to discussing these advances in more detail during our third quarter earnings webcast this afternoon."

61.     In the November 9, 2015 press release, the Company also stated:

FINANCIAL HIGHLIGHTS AND GUIDANCE

As a result of our strategic decision to divest our commercial business, our commercial activities are classified as discontinued operations in our third quarter financial statements.

Operating loss from continuing operations for the third quarter of 2015 was $8.6 million, including $0.6 million in stock based compensation, compared to an operating loss from continuing operations of $10.6 million, including $1.1 million in stock-based compensation for the same period in 2014. Operating loss from continuing operations through the third quarter of 2015 was $26.6 million, including $1.3 million in stock based compensation, compared to an operating loss from continuing operations of $34.2 million, including $3.9 million in stock-based compensation for the same period in 2014. The decrease in net operating loss year-over-year is primarily the result of the completion of enrollment in our Phase 3 PRESENT trial for NeuVax, as well as the decrease in stock based compensation, and a reduction in legal expenses associated with ongoing litigation and legal proceedings.

Non-operating income or expenses include non-cash charges related to changes in the fair value estimates of the company's warrant liabilities, contingent purchase price liability, and interest expense. The non-cash income related to the changes in the value of our warrant liability for the third quarter of 2015 was $2.1 million versus $6.7 million for the same period in 2014, respectively. The non-cash expense related to the changes in the value of our warrant liability through the third quarter of 2015 was $1.0 million versus a non-cash income of $13.2 million for the same period in 2014, respectively.

Loss from continuing operations for the third quarter of 2015 was $6.4 million, including $2.1 million in non-cash income described above, or $0.04 per basic and diluted share. Loss from continuing operations for the third quarter of 2014 was $3.5 million, including a $6.7 million in non-cash income described above, or $0.03 per basic and diluted share. Loss from continuing operations through the third quarter of 2015 was $28.2 million, including $1.0 million in non-cash expense described above, or $0.18 per basic and diluted share. Loss from continuing operations through the third quarter of 2014 was $22.0 million,

including $13.2 million in non-cash income described above, or $0.19 per basic and diluted share.

Loss from discontinued operations for the third quarter of 2015 was $11.7 million, or $0.07 per basic and diluted share, compared to $2.6 million, or $0.02 per basic and diluted share, for the same period of 2014. Loss from discontinued operations through the third quarter of 2015 was $16.1 million, or $0.11 per basic and diluted share, compared to $6.6 million, or $0.06 per basic and diluted share, for the same period of 2014. Loss from discontinued operations include a $8.1 million non-cash impairment charge from classification of assets held for sale for the three and nine months ended September 30, 2015.

As of September 30, 2015, Galena had cash and cash equivalents of $34.8 million, compared with $23.7 million as of December 31, 2014. The $11.1 million increase in cash through the third quarter of 2015 represents $47.4 raised from issuance of common stock, partially offset by $27.8 million used in continuing operating activities, $5.0 million used in discontinued operating activities, $0.5 million milestone payment for Zuplenz, and $3.0 million in debt service payments.

62.    On the same day, November 9, 2015, the Individual Defendants caused the Company to file its quarterly report on form 10-Q with the SEC. The 10-Q reaffirmed the Company's financial results announced in the press release issued on the same.

63.    On November 20, 2015, the Individual Defendants caused the Company to announce that it had sold its Abstral product to a private company in a deal valued at up to $12 million, with $8 million cash up-front, and up to $4 million in additional cash upon the achievement of certain sales milestones, effective as of November 19, 2015:

SAN RAMON, Calif., Nov. 20, 2015 (GLOBE NEWSWIRE) -- Galena Biopharma, Inc. (NASDAQ:GALE), a biopharmaceutical company committed to the development and commercialization of targeted oncology therapeutics that address major unmet medical needs, today announced the sale of its Abstral® (fentanyl) Sublingual Tablet product to a private company in a deal valued at up to $12 million, with $8 million cash upfront and up to $4 million in additional cash upon the achievement of certain sales milestones, effective as of November 19, 2015. For additional information about the transaction, please refer to the Form 8- K filed with the SEC and available on our website.

"We are pleased to complete this divestiture in a timely manner to allow us to focus our energy and resources solely on our clinical development programs as we believe this strategic shift is in the best interest of our patients, our

shareholders, and the long-term success of our company," said Mark W. Schwartz, Ph.D., President and Chief Executive Officer of Galena Biopharma.

64.     On December 11, 2015, the Individual Defendants caused the Company to announce the departure of Dunlap, effective December 31, 2015:

> Mr. Ryan Dunlap, the current Chief Financial Officer (CFO) of the registrant, advised that he and his family will be unable to relocate to the Company's new headquarters' in San Ramon, California, and as a result he will leave the Company effective December 31, 2015. Mr. Dunlap indicated that he has no disagreements with management. In order to facilitate an orderly transition, the Company and Mr. Dunlap are negotiating a consulting arrangement. In connection with his departure, the Company and Mr. Dunlap are negotiating a separation agreement and general release, most of the terms of which were previously negotiated pursuant to Mr. Dunlap's Employment Agreement. The Company has instituted a search for a CFO.

65.     At no time did any of the preceding public statements inform Galena's stockholders that the Individual Defendants had: (i) directed Galena to institute an illegal marketing/rebate program; (ii) focused sales and marketing efforts of Abstral to patients for non-FDA approved uses; or (iii) that the Individual Defendants were knowingly selling a majority of all prescriptions of Abstral to Drs. Ruan and Couch, who the Individual Defendants had knowledge were running an illegal pill mill.

## THE TRUTH EMERGES:

### The Company Announces the Receipt of A Subpoena From the U.S. Government In Connection With Abstral

66.     On December 22, 2015, the Company announced the receipt of a subpoena in connection with its sales of Abstral:

> On December 16, 2015, Galena Biopharma, Inc. ("Galena") received a subpoena from the U.S. Attorney's Office for the District of New Jersey. The subpoena requests the production of a broad range of documents pertaining to marketing and promotional practices related to the product ABSTRAL® (fentanyl) Sublingual Tablets. Galena intends to cooperate with the government's investigation. Galena can make no assurances as to the time or resources that will need to be devoted to this inquiry or its final outcome, or the impact, if any, of

this inquiry or any proceedings on Galena's business, financial condition, results of operations and cash flows.

67.     On March 10, 2016, the Individual Defendants caused the Company to file its annual report on Form 10-K with the SEC. The 10-K was signed by defendants Hillsberg, Ashton, Chin, Einhorn, Galliker, Nisi and Schwartz. Therein, the Company disclosed:

> We are subject to U.S. federal and state health care fraud and abuse and false claims laws and regulations, and we recently have been subpoenaed in connection with marketing and promotional practices related to Abstral. Prosecutions under such laws have increased in recent years and we may become subject to such prosecutions or related litigation under these laws. If we have not fully complied with such laws, we could face substantial penalties.

> Our former commercial operations and development programs are subject to various U.S. federal and state fraud and abuse laws, including, without limitation, the federal False Claims Act, federal Anti-Kickback Statute, and the federal Sunshine Act.

> ***A federal investigation of two of the high-prescribing physicians for Abstral has resulted in the criminal prosecution of the two physicians for alleged violations of the federal False Claims Act and other federal statutes. The criminal trial is set for some time in 2016. We have received a trial subpoena for documents in connection with that investigation and we have been in contact with the U.S. Attorney's Office for the Southern District of Alabama, which is handling the criminal trial, and are cooperating in the production of documents. We are a target or subject of that investigation.*** There also have been federal and state investigations of a company that has a product that competes with Abstral in the same therapeutic class, and we have learned that the FDA and other governmental agencies may be investigating our Abstral promotion practices. On December 16, 2015, we received a subpoena issued by the U.S. Attorney's Office in District of New Jersey requesting the production of a broad range of documents pertaining to our marketing and promotional practices for Abstral. We have been in contact with the U.S. Attorney's Office for the District of New Jersey and are cooperating in the production of the requested documents. We are unable to predict whether we could become subject to legal or administrative actions as a result of these matters, or the impact of such matters. If we are found to be in violation of the False Claims Act, Anti-Kickback Statute, Patient Protection and Affordable Care Act, or any other applicable state or any federal fraud and abuse laws, we may be subject to penalties, such as civil and criminal penalties, damages, fines, or an administrative action of exclusion from government health care reimbursement programs. We can make no assurances as to the time or resources that will need to be devoted to these matters or their outcome, or the impact, if any, that these

matters or any resulting legal or administrative proceedings may have on our business or financial condition.

The federal False Claims Act prohibits persons from knowingly filing, or causing to be filed, a false claim to, or the knowing use of false statements to obtain payment from, the federal government. Qui tam suits filed under the False Claims Act can be brought by any individual on behalf of the government and such individuals, commonly known as "relators" or "whistleblowers," may share in any amounts paid by the entity to the government in fines or settlement. The frequency of filing qui tam actions has increased significantly in recent years, causing greater numbers of health care companies to have to defend such qui tam actions and pay substantial sums to settle such actions.

Emphasis added.

68.     On May 10, 2016, the Individual Defendants caused the Company to file its quarterly report on form 10-Q with the SEC. Therein, the Company stated:

On March 18, 2013, we acquired Abstral® (fentanyl) sublingual tablets for sale and distribution in the United States from Orexo AB (ORX.ST), a specialty pharmaceutical company based in Sweden. Abstral has been approved by the U.S. Food and Drug Administration (FDA) and is a transmucosal immediate-release fentanyl (TIRF) product.

Under our agreement with Orexo, we assumed responsibility for the U.S. commercialization of Abstral and for all regulatory and reporting matters in the U.S. We also agreed to establish and maintain through 2015 a specified minimum commercial field force to market, sell and distribute Abstral and to use commercially reasonable efforts to reach the specified sales milestones. Orexo is entitled to reacquire the U.S. rights to Abstral from us for no consideration if we breach our obligations to establish and maintain the requisite sales force throughout the marketing period. We launched U.S. commercial sales of Abstral in the fourth quarter of 2013.

In exchange for the U.S. rights to Abstral, (1) we paid Orexo $10 million in March 2013 and a $5 million milestone payment in cash in October 2013 upon the approval by the FDA of a specified U.S. manufacturer of Abstral; and (2) we agreed to pay to Orexo: (a) three one-time future cash milestone payments based on our net sales of Abstral; and (b) a low double-digit royalty on future net sales. No further milestone or royalty payments will be due after the date on which all claims of the last remaining licensed patents expire (currently 2019) or become invalidated by a governmental agency.

On November 19, 2015, Galena Biopharma, Inc. (the "Company") and Sentynl Therapeutics Inc., a Delaware corporation ("Sentynl"), entered into and closed

upon an Asset Purchase Agreement (the "Purchase Agreement"), pursuant to which the Company agreed to sell to Sentynl and Sentynl agreed to purchase from the Company, certain assets of the Company related to and including its Abstral® (fentanyl) sublingual tablets product ("Abstral"). The assets sold and assigned to Sentynl pursuant to the Purchase Agreement included all of the Company's rights and interests in the Asset Purchase Agreement by and between the Company and Orexo AB ("Orexo") dated March 15, 2013, and the License Agreement by and between the Company and Orexo dated March 18, 2013 (collectively, the "Orexo Agreements"). The Company's future obligations under the Orexo Agreements were assumed by Sentynl pursuant to such assignment. The Purchase Agreement further provides that the Company will continue to be responsible for any pre-closing liabilities and obligations related to Abstral, as well for certain channel liabilities related to Abstral for a period of time post-closing. In connection with the transactions contemplated by the Purchase Agreement, the Company assigned to Sentynl all of its rights to and interests in the Orexo Agreements. In connection with such assignment, Orexo released the Company from any future liabilities and obligations under the Orexo Agreements.

The total potential consideration payable to the Company under the Purchase Agreement is $12 million, comprised of an $8 million upfront payment and up to an aggregate of $4 million, consisting of two one-time payments based on Sentynl's achievement of "net sales" of Abstral in amounts ranging from $25 million to $35 million.

69.    On August 9, 2016, the Individual Defendants caused the Company to file its quarterly report on form 10-Q with the SEC. Therein, the Company stated:

On November 19, 2015, the Company and Sentynl Therapeutics Inc., a Delaware corporation ("Sentynl"), entered into and closed upon an Asset Purchase Agreement (the "Purchase Agreement"), pursuant to which the Company agreed to sell to Sentynl and Sentynl agreed to purchase from the Company, certain assets of the Company related to and including its Abstral® (fentanyl) sublingual tablets product ("Abstral"). The assets sold and assigned to Sentynl pursuant to the Purchase Agreement included all of the Company's rights and interests in the Asset Purchase Agreement by and between the Company and Orexo AB ("Orexo") dated March 15, 2013, and the License Agreement by and between the Company and Orexo dated March 18, 2013 (collectively, the "Orexo Agreements"). The Company's future obligations under the Orexo Agreements were assumed by Sentynl pursuant to such assignment. In connection with such assignment, Orexo released the Company from any future obligations under the Orexo Agreements. The Purchase Agreement further provides that the Company will continue to be responsible for any pre-closing liabilities and obligations related to Abstral, as well for certain channel liabilities and rebates related to Abstral for a period of time post-closing.

The total potential consideration payable to the Company under the Purchase Agreement is $12 million, comprised of an $8 million upfront payment and up to an aggregate of $4 million, consisting of two one-time payments based on Sentynl's achievement of "net sales" of Abstral in amounts ranging from $25 million to $35 million.

70.     On January 9, 2017, the Individual Defendants caused the Company to file a Form 8-K with the SEC. Therein, the Company disclosed the following:

**Abstral Investigation**

As previously disclosed, on December 16, 2015, we received a subpoena issued by the U.S. Attorney's Office for the District of New Jersey requesting the production of a broad range of documents pertaining to our marketing and promotional practices for Abstral, the commercial product we sold in the fourth quarter of 2015. We have been in contact with the U.S. Attorney's Office for the District of New Jersey and Department of Justice, and we have come understand that the investigation being undertaken by the U.S. Attorney's Office for the District of New Jersey and Department of Justice is a criminal investigation in addition to a civil investigation that could ultimately involve the Company as well as one or more current and/or former employees. Pursuant to the Company's charter, we are currently reimbursing any former and current employees' attorney's fees with respect to the investigation. We are cooperating with the civil and criminal investigation, and through our outside counsel we have recently begun preliminary discussions with the government aimed at the ultimate resolution of the investigation regarding the Company.

71.     On January 31, 2017, the Company announced the resignation of defendant Mark W. Schwartz as President, Chief Executive Officer ("CEO"), and a member of the Board of Directors.[9]

72.     ████████████████████████████████████████
████████████████████████████████████████████████

---

[9]     News reports characterized Mark W. Sanchez's as being "sacked" as opposed to a resignation. See "Galena Sacks CEO Amid Escalating Criminal Probe Into Fentanyl Drug Marketing." Fuerstein, Adam. The Street. Available: < https://www.thestreet.com/story/13973776/1/galena-sacks-ceo-amidst-escalating-criminal-probe-into-fentanyl-drug-marketing.html>

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5 ████████████████████████████████████████ As a result of the

6 Individual Defendants' actions, the Company's public filings throughout the Relevant Period

7 were materially false and misleading and the Company has been damaged.

**The Company's Dealings with Dr. Xiulu Ruan and Dr. John Patrick**

73.     The two high prescribing physicians mentioned in the 2015 10-K are Dr. Xiulu

Ruan and Dr. John Patrick Couch, who were the principals of Physicians Pain Specialists

of Alabama clinics and also co-owned C&R Pharmacy.

74.     On February 22, 2017, and in the criminal trial against Dr. Ruan and Dr. Couch,

both doctors were found guilty on virtually all counts of operating a "pill mill". During the

Ruan/Couch criminal trial, the following evidence was introduced, establishing:

(a) Dr. Ruan and Dr. Couch jointly owned and operated C&R Pharmacy. Nine out of 10

prescriptions filled at the pharmacy from April 2012 to May 2015 were for the

Fentanyl-based pain medications Subsys and Abstral.

(b) Dr. Ruan and Dr. Couch doctors bought a significant number of shares of Galena

Biopharma during that period.

(c) During that period Galena Biopharma's share price grew from $7 a share to $60 a

share.

(d) C&R Pharmacy also set up a rebate program with Galena that both doctors allegedly

profited from.

(e) Charts showing the amount of prescriptions for Abstral written in 2014:

- •     1,302 - Dr. Ruan

- •     649 - Dr. Couch

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

- 611 - Dr. Rowe[10]

(f) Drs. Ruan and Couch prescribed 68,116 and 45,285 units of fentanyl, respectively, during the time frame of the indictment, making the doctors the number one and number two prescribers of the drug in Alabama. ████████████████

████████████████████████████████

████████████████████████████████

████████ At other points relevant to the indictment, Drs. Ruan and Couch were the top prescribers of Subsys and Abstral in the entire country.

(g) The Assistant U.S. Attorney stated that Drs. Ruan and Couch were "very important" to Insys and Galena and claimed that top executives from both pharmaceutical companies had traveled from Arizona and Oregon, respectively, to meet the doctors in Mobile.

(h) An email chain was introduced where a pharmaceutical company executive assured Dr. Ruan that a particular pain medication, Abstral, was not directly implicated in the Michigan case, but was merely one of a class of drugs that Dr. Awerbuch (of the INSYS case) was accused of dispensing improperly.

75. ███████████████████████████████████████
████████████████████

76. The trial transcripts are particularly damning for Drs. Ruan and Couch and serves to further confirm the Board's knowledge of the illegal scheme.

77. For example, David Corin (Galena's National Sales Director) testified as part of the criminal trial against Drs. Ruan and Couch. David Corin explained to the jury that *Galena kept "an internal* document that [Galena] would send out on a quarterly basis with all of our

---

[10]     Dr. Rowe was a close friend of Dr. Ruan and that the next competitor after those three doctors only wrote 153 Abstral prescriptions.

prescribers in the country, how many prescriptions they had written each quarter." According to the internal Galena document, from third quarter 2013 through fourth quarter 2014, Drs. Ruan and Couch were the largest prescribers of Abstral, with Dr. Ruan as the number one prescriber and Dr. Couch as the number two prescriber. *The third highest Abstral prescriber was* Dr. Rho, who was a "good friend" of Dr. Ruan and who was also a Galena shareholder, as Dr. Ruan explained in an email he sent to Defendant Bernarda, which was copied to Chris Lento, the Company's Vice President U.S. Sales & Commercial Operations Lento. As stated above, Mr. Lento made numerous presentations to the Board and appeared at each regular meeting to present information to the Board regarding sales and marketing operations. From third quarter 2013 through fourth quarter 2014, Dr. Ruan wrote 1,302 prescriptions for Abstral, Dr. Couch wrote 649 prescriptions for Abstral, and Dr. Rho wrote 611 prescriptions for Abstral. By comparison, the next highest prescriber of Abstral (i.e., the fourth highest Abstral prescriber in the country) during that same period wrote only 153 prescriptions for Abstral. In other words, the fourth highest prescriber of Abstral in the country wrote only about 11.7% as many Abstral prescriptions as Dr. Ruan, only about 23.6% as many Abstral prescriptions as Dr. Couch, and only about 25% as many Abstral prescriptions as Dr. Rho. Thus, as David Corin (Galena's National Sales Director) confirmed, the only doctor "in the ballpark with" Drs. Ruan and Couch was Dr. Rho – another "pain management doctor" who was a known shareholder of Galena and who predominately treated, and prescribed Abstral to, non-cancer patients. Notably, the internal Galena document that kept track of all Abstral prescribers also noted whether the Abstral prescribers received payments from Insys. David Corin confirmed that Galena's internal document tracked which Abstral prescribers "were paid by Insys" and explained that "for many doctors we want to see if they've been compensated by [Insys ]."

78.     The Individual Defendants knew and even encouraged doctors, including Dr. Ruan, to prescribe Abstral to predominantly non-cancer patients. Indeed, according to emails from October 2013 between Lento and Dr. Ruan - emails that were copied to defendant Schwartz

(the Company's CEO who "resigned" – and who also directly reported to the Board during the Relevant Period), Allan Valmonte (Galena's Director of Clinical Affairs), and David Rowan (Galena's Regional Business Director) – Mr. Lento on behalf of Galena encouraged Dr. Ruan to enroll non-cancer patients in Galena's "RELIEF" program. David Corin (Galena's National Sales Director) said the purpose of the "RELIEF" program was to track how patients taking Abstral were doing with the drug; however, the program also conveniently paid doctors $500 for every patient the doctors enrolled in the RELIEF program. When Dr. Ruan explained that he could not participate in the RELIEF program because his "practice does not have very many patients who qualify" *(i.e.,* does not have cancer patients), Lento corrected Dr. Ruan and tried to persuade Dr. Ruan to enroll his non-cancer patients in the program, saying:

> I was surprised to receive this note today via Neil. I had thought that you were very excited to participate in Galena's RELIEF Registry. I believe there might exist some confusion on patient eligibility. Would it be possible to discuss at your earliest convenience? ***I'm copying Mark Schwartz, the Galena COO***, and Allan Valmonte, the director of clinical affairs, and Dave Rowan regional business director. Thanks for your consideration.

> Emphasis added.

79.     David Corin confirmed that Dr. Ruan's stated reason for not participating in the RELIEF program was that Dr. Ruan said "he doesn't have many cancer pain patients." However, as David Corin explained, Dr. Ruan misunderstood the program's eligibility because Galena's RELIEF program actually enrolled both "cancer and non-cancer patients." In other words, Galena paid doctors for prescribing Abstral even when Galena knew that the patients receiving the prescription were not cancer patients. In the DOJ press release announcing its settlement with Galena, the DOJ referred to the RELIEF program as "nominally designed to collect data on patient experiences with Abstral, but acted as a means to induce the doctors to prescribe Abstral."

80.     Thus, since at least October 2013, defendant Schwartz and Mr. Lento (███ ███████████████████████████████████████████) knew that PPSA did not have

cancer patients but instead prescribed Abstral for off-label purposes. Moreover, the Individual Defendants were well aware that PPSA was not a cancer treatment facility and that Drs. Ruan and Couch were not oncologists (i.e., cancer specialists). Indeed, Justin Palmer, a nurse practitioner at PPSA from July 2010 until it was shutdown in May 2015, admitted that the vast majority (if not all) of PPSA's Abstral prescriptions were written to non-cancer patients, explaining that "we didn't have many cancer patients" and that for the entire period "from 2011 to 2015," he had seen maybe "10 or 15 active cancer patients." As Justin Palmer testified, "we didn't have that many cancer patients. I mean, I used it, I prescribed it for migraines that, you know, weren't responsive to other things. And if I could, I would give it to the patients for breakthrough pain .... " Bridgette Parker, another nurse practitioner at PPSA from 2012 until its shutdown in May 2015, also testified that Drs. Ruan and Couch prescribed Abstral to non-cancer patients even though that was not what the drug's indication. "[I]t was used off label a lot, you know, for anything we could use it on," Ms. Parker testified. Ms. Parker further testified that she thought the off-label uses for which Dr. Ruan and Dr. Couch prescribed Abstral were inappropriate, saying "I felt that it was used often when it shouldn't be." Ms. Parker also confirmed that both Dr. Ruan and Dr. Couch "encouraged" her to prescribe Abstral.

81.  ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Justin Palmer (nurse practitioner at PPSA) testified that executives and representatives from Galena frequently came to PPSA to meet with Dr. Ruan and Dr. Couch: "[T]hat was commonplace, somebody coming from, you know, Abstral or Galena" to meet with Dr. Ruan and Dr. Couch. Mr. Palmer explained that he knew the executives and representatives were there because he saw them at the office and would

sometimes meet them. Indeed, defendant Schwartz and Mr. Lento, along with other Galena representatives, frequently communicated with Drs. Ruan and Couch and even traveled to Mobile for promotional visits with the two doctors. Indeed, among the emails introduced as part of the trial were emails from December 18, 2014 between Lento, David Corin, and Schwartz's assistant discussing how to record defendant Schwartz, David Corin, and Jeff Palmer's dinner with Dr. Ruan, with Mr. Lento stating that he has located Dr. Ruan's provider identification number in Galena's system "many times."

82.   For example, on February 25, 2014, Messrs. Lento and Corin took a trip to Mobile to visit with Drs. Ruan and Couch who were upset with the Company because the stock price had dropped after certain Galena insiders made massive stock sales-actions that became the subject of a Cease and Desist Order by the SEC. This upset Dr. Ruan and Dr. Couch because they had each accumulated large amounts of Galena stock. Corin explained that he knew Drs. Ruan and Couch were upset about the insider sales because "[t]hey sent several emails to my boss, whose name was Chris Lento, and others in the organization. And I was-I had been forwarded those messages." According to Corin, Drs. Ruan and Couch demanded "that Galena fire the board of directors, fire the CEO, and a change in leadership." Corin said that the demands of Drs. Ruan and Couch were taken seriously by Galena "[b]ecause they were [Galena's] highest Abstral prescribers" and were, Corin agreed, "important individuals for Galena." Indeed, Galena's CEO Mark Ahn was ultimately fired.

83.   Defendant Schwartz, Galena's former CEO, made at least two trips to Mobile to visit with Drs. Ruan and Couch during the Relevant Period: one trip in November 2014 and one trip in February 2015. David Corin explained that defendant Schwartz made these trips to Mobile "[b]ecause Dr. Ruan and Dr. Couch wanted to meet with him [Schwartz]." According to Corin, *"[i]twas demanded* by Dr. Ruan that he [Schwartz] meet with him [Ruan]." Defendant Schwartz, as CEO, reported directly to the Board of Directors.

84.    Corin made several other trips to Mobile to visit Drs. Ruan and Couch, including trips on September 24, 2014, January 20, 2015, and April 21, 2015. According to Corin, *"[Schwartz]* wanted us [Galena representatives] to be more consistent in how often we came" to visit Drs. Ruan and Couch. Corin explained that "[Schwartz] wanted us to have a more regular cadence in our visits" to Drs. Ruan and Couch "[b]ecause other companies were visiting consistently and the higher-ups in those companies, as well - from CEOs to most C-level employees. It was important that we had a presence as well." Corin confirmed that other companies, including Insys, sent their CEOs and other high-level people to meet with Dr. Ruan and Dr. Couch, and that this was part of "what prompted more meetings or the need for more regular meetings [with Drs. Ruan and Couch] from executives at Galena." Corin explained that Dr. Ruan "made clear that we weren't giving them the same attention that other customer - other companies were." Corin elaborated that "[h]e *[Dr.* Ruan] explained it very clearly that we weren't doing enough. As a business, we weren't listening to them [Dr. Ruan and Dr. Couch] enough and we weren't going to be successful."

85.    Senior Galena executives' frequent trips and meetings with Drs. Ruan and Couch (as well as the kickbacks paid by Galena to Drs. Ruan and Couch pursuant to the rebate agreement*)* constituted illegal promotion of Abstral for off-label purposes. ████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████ Nevertheless, the Individual Defendants, however, repeatedly and continually promoted Abstral to Drs. Ruan and Couch, and the Individual Defendants encouraged and offered incentives to these doctors to continue prescribing Abstral for off-label purposes. Indeed, the Individual Defendants actively sought to help Drs. Ruan and Couch get prior authorizations for their Abstral prescriptions to non-cancer patients, and even flew senior Galena executives to visit with Drs. Ruan and Couch about how to get insurance coverage for their off-label Abstral prescriptions. For example, Corin's January 20, 2015 trip to

Mobile was to "introduce Dr. Ruan and Dr. Couch to Steven Brennan" who "was responsible for [Galena's] GPS program, which was our prior authorization program."

86.     Corin first met with Dr. Ruan in November 2013, when he, along with Allan Valmonte (Galena's Director of Clinical Affairs) and Jeff Palmer (sales representative from Galena), traveled to Mobile to take Dr. Ruan to a dinner meeting. During the meeting, Dr. Ruan "talked about what a high prescriber he was of all the products in the class and recommended that it would be good for Galena to have him as a speaker." Mr. Corin explained that after the meeting, Dr. Ruan "asked our sales representative if he could be – rather than paid a speaking fee, to be paid in [Galena] stock." Dr. Ruan made the request for stock compensation to Galena's "sales representative who then asked the question up the ladder."

87.     Moreover, according to Corin, Dr. Ruan expressed at "[e]very single meeting" that "[h]e was very upset with the company that we [Galena] didn't support him the way other companies did." Dr. Ruan expressed that Galena was not spending enough time with him and "[t]hat we didn't do enough as a company to support physicians."

88.     As Corin further testified, in 2014, "the company and C&R Pharmacy [Dr. Couch and Dr. Ruan's pharmacy] partnered on a marketing services agreement," which was "also known as the rebate agreement." ***The agreement was entered into between Galena and C&R Pharmacy in October 2014. Corin testified that defendant Schwartz signed the marketing services/rebate agreement with C&R Pharmacy. Under the rebate agreement, Galena would pay C&R Pharmacy a certain percentage for the prescriptions of Abstral the pharmacy sold. According to the rebate agreement, the percentage Galena was to pay C&R Pharmacy ranged from 8.75% to 20%, depending on the prescription dollars C&R Pharmacy sold in a given month.*** As Corin explained, "[t]he average prescription [of Abstral] could be several thousand dollars. For the higher doses, you can get into the $10,000 range." Corin confirmed that "when this agreement went into place, C&R Pharmacy would earn more money from filling Abstral prescriptions." Corin said that he was aware that Drs. Couch and Ruan owned C&R Pharmacy.

1  The DOJ would later allege in a lawsuit filed in the District of New Jersey that the rebate

2  agreement was an illegal kickback given in exchange for writing prescriptions for Abstral.

3        89.    As Justin Palmer (nurse practitioner at PPSA) testified, "C&R was part of PPSA,

4  at least in my mind, and it was connected to the building." Mr. Palmer further testified that the

5  PPSA patients essentially always got their Abstral prescriptions filled at C&R Pharmacy, which

6  was connected to the PPSA clinic. According to Mr. Palmer, most pharmacies did not carry

7  Abstral because it was so expensive: "It was such an expensive drug, that nobody else really

8  carried it and we did." Thus, by providing percentage payments to C&R Pharmacy (owned by

9  Drs. Couch and Ruan) for the prescriptions of Abstral filled there, Galena was paying Drs. Ruan

10  and Couch for the prescriptions of Abstral they wrote-the definition of a kickback. Indeed, David

11  Corin (Galena's National Sales Director) confirmed that the rebate agreement was made "in

12  order to add additional profit to C&R's prescrib[ing] or dispensing of Abstral." In other words,

13  the Individual Defendants caused Galena to enter into the rebate agreement with C&R Pharmacy

14  to incentivize Drs. Couch and Ruan to write more prescriptions for Abstral and to write those

15  prescriptions to patients Galena knew to be non-cancer patients. The rebate agreement achieved

16  its intended purpose of driving up Abstral prescriptions and Galena revenues, as Mr. Corin

17  admitted that the number of prescriptions for Abstral from Dr. Ruan and Dr. Couch increased

18  after the rebate agreement went into effect.

19        90.    FBI agent Amy White also testified during the criminal trial of Drs. Ruan and

20  Couch. As part of Agent White's testimony, the prosecution introduced a Federal Reserve

21  document reflecting a February 18, 2015 wire in the amount of $97,924 from Galena to C&R

22  Pharmacy's Wells Fargo bank account. Agent White testified that the FBI believed the $97,924

23  wire to be a payment pursuant to the rebate agreement.

24        91.    Moreover, Corin also testified that Galena had rebate agreements like the one

25  with C&R Pharmacy with several oncology dispensing clinics and with two pharmacies that

26

27

28

were non-oncology dispensing clinics (meaning "not clinics in cancer centers"). According to Corin, the agreements would essentially be the same "the only difference is it's C&R."

92.     Other evidence admitted at the trial-revealed that Galena also invited both Drs. Ruan and Couch to attend Galena's Advisory Board Meetings. Emails, including an email from December 5, 2013 exchanged between Dr. Ruan and Lento, reflect the intention that Dr. Ruan would act in an "advisory" capacity for Galena, with Dr. Ruan stating: "/am very excited about the opportunity to be involved with Galena at the highest advisary/consultatory level, as we discussed in our previous conversations." Dr. Couch attended at least one of Galena's Advisory Board Meetings, for which, according to the US Department of Justice, Galena paid Dr. Couch $5,000 plus expenses. According to other emails presented during the trial, Dr. Ruan ultimately decided not to attend Galena's Advisory Board Meeting due to concerns that he might hear inside information that would prevent him from freely trading his Galena stock.

93.     Beginning in November and December 2013, Drs. Ruan and Couch began purchasing large amounts of Galena stock. According to evidence presented during the criminal trial, the two doctors expended more than $1.6 million in purchases of Galena shares in a little over a 6-month period.

94.      The Individual Defendants were also aware that Drs. Ruan, Couch, and Rho (Dr. Ruan's "good friend" who also communicated directly with Galena officers) were trading in Galena stock at the same time that they were the three largest Abstral prescribers-by huge and inordinate margins wherein these three doctors accounted for approximately 40% of all Abstral sales, Galena's only source of income.

95.     For example, on January 20, 2014, Dr. Ruan sent Lento an email entitled "advisory board meeting." In the email, Dr. Ruan wrote:

> Hi, Chris, it seems that I will not be able to make this weekend's advisory board meeting. The reason is I recently purchase some stocks from Galena on line. Now, if I get involved with the co at advisory board level, then I will be considered "insider", right? If so, there will be a lot of restrictions and regulations on how these stock can be traded. Also, there may be some legal trouble once I know

more about the Co and owns stocks. At the current level, I know no more than general public, therefore, there is no risk for me to trade the stocks I purchased. I have sent some information to my lawyer to find out the legality of this, while owning stocks and participating the board meeting. He has not emailed me yet. So, I figured I just want to let you know. Hope everything is well and hope you all have a successful meeting this weekend. I have not signed the agreement yet with Galena, so I am not an "insider". Have a great weekend!

96.     Thus, since at least January 20, 2014, Lento knew that Dr. Ruan had purchased Galena stock and was looking to trade that stock without "risk" or "restrictions." ████████

████████████████████████████████████████████████████████

97.     Indeed, Dr. Ruan's decision not to participate in Galena's Advisory Boarding meeting was entirely due to his desire to be able to trade stock since he "plan[ned] to sell quick on the side." As Dr. Ruan said in a January 18, 2014 email to Dr. Couch:

Pat, I am reconsidering whether I should go to the next weekend's Galena Advisory Board meeting. I am concerned that once I am involved with them at that level, then I am considered "insider" and subjecting myself to more restrictions and regulations, etc. What do you think? Remember Martha Stewart went to jail for 6 months after avoiding $46K loss in stock? As we both have purchased a good number of stocks and plan to sell quick on the side. It will save me a lot of worries if I am not involved with the Co as their advisory board member so that know no more than the general public. I will check with my attorney Tom Galloway for his advice. You may ask Boe's opinion on this too. I just want to make sure neither us or PPSA gets involved in a bad way! Maybe I am paranoid, but since we both have purchased some stocks and we use their products more than others. So, I am waiting for Tom to give me his opinion on this before I made my finial decision whether I will go or not. Just a few links below regarding this issue.

98.     In an email he sent to Dr. Couch on February 2, 2014, Dr. Ruan further discussed the doctors' plans to manipulate Galena stock while "play[ing] a big role" in propping up the stock price by overprescribing Abstral in a "dominant fashion." Dr. Ruan's email read, in relevant part:

When I read about the history of lnsys, considering their initial IPO on May 7, 2013 at $8, and within 7 months, it hit $60, despite the Subpoena by inspector general, I believe Gale has much better chance of hitting much higher. So, I will

hold mine for at least a year, giving it 3 quarters to grow. It certainly has a chance be close to Insys in term of market share.

Also, considering I have lost millions on real estate, I could afford to lose all mine in this, but there is a good chance that it will bring the most. I like the chances. I will wait till I see at least 3 quarters. This is the product we can play a big role. I am sure we can with Zogenix, but not in this dominant fashion as many other providers can do the same, but with Abstral

So, I believe it is worth the risk!

99.     In emails Dr. Ruan sent to a friend on February 17, 2014, Dr. Ruan further described his belief that "there will be a major market share taking over, which may drive the stock up" and his plan to "hold[] them for 1.5 years, give Galena enough time to eat the market share from Insys, as I believe it will."

100.     According to testimony from Justin Palmer, a nurse practitioner at PPSA who also bought stock in Galena at the advice of Dr. Couch, PPSA put more patients on Abstral after Dr. Ruan, Dr. Couch, and Mr. Palmer bought Galena stock. Mr. Palmer's testimony included the following exchange:

Q:     Did you have occasion, after you bought Galena stock, to discuss prescribing Abstral with Dr. Couch?

A:     We -- we did. We talked about -- I mean, patients that were, you know, candidates or suitable candidates for that drug.

Q:     Did you begin to put a number of individuals on Abstral, number of patients?

A.     Yes, yes.

Q:     Had you been encouraged to do that by anyone?

A:     I don't know if l would say encouraged. But, you know, it was suggested to find people that could benefit or - I guess so, I mean.

Q:     What was the purpose of that, finding people to put on Abstral?

A:     Well, I mean, we did have shares in the company. So –

Q:      You and who?

A:      Dr. Couch and, I guess Dr. Ruan. And it was -- you know, it would have been financially a good decision.

Q:      For you?

A:      For me.

Q:      And for who else?

A:      For Dr. Couch and Dr. Ruan.

Q:      Did the Abstral prescriptions at PPSA go up during that time initially?

A:      Yes.

Q:      After you bought stock?

A:      Yes.

101.    Mr. Palmer again later admitted that PPSA "started writing more Abstral" prescriptions after he, Dr. Ruan, and Dr. Couch purchased Abstral stock and explained that the increase was not due to an increase in cancer patients:

Q:      Was there some outbreak of people coming to PPSA with cancer during this period of time that you're aware of?

A:      No.

102.    As Mr. Palmer had previously testified, PPSA "didn't have many cancer patients," and for the entire period "from 2011 to 2015," he had seen maybe "10 or 15 active cancer patients."

103.    On March 16, 2014, Dr. Ruan emailed Remy Bernarda ("Bernarda") (Galena's Senior Vice President of Investor Relations & Corporate Communications), copying Mr. Lento, in which Dr. Ruan requested that he, Dr. Couch, and Dr. Rho be given a chance to speak with Galena's Board of Directors. Dr. Ruan stated the following:

Remy, hope you have had a good weekend! I have had quite a few conversations with a few physicians who have all invested in your company.

61

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Dr. James Rho, a good friend of mine, who is an interventional pain specialist in CA and also a strong believer in Abstral and an expert in TIRF, is interested in joining the conference on Thursday with you and your BOD. I believe he should be of no stranger to your Abstral sales team, even if you may not know him. As a matter of fact, he has shared with me many positive feedback from using Abstral since last Fall. Just like Dr. Couch and I, Dr. Rho also believes Galena's product and its pipeline, and therefore a share holder as well.

I had lengthy discussion with Dr. Rho and Dr. Couch this weekend. We feel that if will be very beneficial if we could attend this conference together, have a honest discussion with the Board of Director(s) of Galena, to express our feeling, concerns, opinions/recommendations, as we are not only share holders, but also your clients, and customers to some extent. I hope that is OK with you and your Board of Director(s).

Thank you very much for your kind help!

104.    In response to Dr. Ruan's email, The Individual Defendants facilitated a call for Drs. Ruan, Couch, and Rho to speak with a member of Galena's Board of Directors, Bill Ashton, and with Bernarda if she could participate. Indeed, Bernarda sent Dr. Ruan a response email in which she stated, in pertinent part:

That sounds great and we appreciate your support. From Galena, you will be speaking with our Board Member, Bill Ashton, and his bio is below. I am traveling, but will try to join the call as well. Dr. Rho, here are the conference call details ....

105.    Thus, despite knowing that the three highest prescribers of Abstral (by significant margins) were also trading Galena stock, the Individual Defendants responded by allowing these doctors to have even greater sway over the Company by arranging a call in which the doctors could voice their "feeling[s], concerns, opinions/recommendations" to a member of Galena's Board of Directors and one of Galena's senior executive officers. As explained in a separate email from Dr. Ruan to Dr. Rho, "[t]he purpose of this talk is to express our opinion to push them to replace their CEO" and "to give them the impression that if they do not do it, we will switch to other Cos and its products altogether (I will use [sic] express this in a indirect way, but enough for them to understand what we will do if they don't do it)" since "as you know very

well, they know who we are .... " Dr. Ruan further explained in the email: "Since you [Dr. Rho], Dr. Couch, and I are all share holders of the [sic] and together we represent a very significant portion of their business, we have a better chance of making it if team up together to get this done."

106. On April 14, 2014, Dr. Ruan again emailed Bernarda, copying Mr. Lento, writing the following, in reference to Galena's insider trading scandal:

> Hi, Remy, how are you!? It has been a while since we last communicated. I hope this email could you (assuming you have not left yet).
>
> I dont even know where to start! In my life, I have never seen something like this, when a truly healthy, promising Co (Galena), with unique pipeline and solid a FDA approved product, employees with good morale and working ethics, has been totally ruined, not by natural disaster, politicians, or competition, but by its own executive officers and its board of directors, because of their blatant, insatiable greed and selfishness! To them, everything can be sacrificed, as long as their pockets are filled up! They dont give a damn about other shareholders' interest, the market, the public trust, the reputation of the company, their employees, and their customers, and the patients! What bothers everyone is the fact that the supervising BOD and its executive officers created this mess in cahoots! *I agree with many of other share holders that the executive team and BOD need to be replaced ASAP,* as no one would like to see Galena end up filing bankruptcy!! No one will believe whatever your CEO or BOD say or do! Their presence with Galena will be enough to wipe out any confidence/trust/hope from the public which is what needed to save Galena! The only thing that may save the Co is the change in the executive team and its BOD!!! This needs to happen and nothing can replace it!!! No one can/will develop any trust in them!

> Emphasis added.

107. As Corin had testified, the demands of Drs. Ruan and Couch were taken seriously by Galena "[b]ecause they were [Galena's] highest Abstral prescribers" and were, Corin agreed, "important individuals for Galena." Indeed, Mark Ahn was fired from Galena in August 2014.

108. In allowing, and even encouraging and enabling, these individuals to dictate much of Galena's success while simultaneously failing to disclose their stock ownership as required by the Sunshine Act, the Individual Defendants were complicit conspirators in these doctors' attempts to manipulate Galena stock for their personal profit. In fact, Dr. Ruan described his

desire to be able "to trade the stocks [he] purchased'' without "risk" or "restrictions" directly to Lento in January 2014. Despite that knowledge, the senior Galena executives continued to court Drs. Ruan and Couch-making frequent trips to Mobile to take them to dinner, permitting Drs. Ruan, Couch, and Rho to speak directly with Galena officers placing Dr. Couch on Galena's Advisory Board, assisting the doctors in getting Abstral covered by insurance via Galena's GPS program, and establishing a rebate agreement with C&R Pharmacy in order to get Drs. Ruan and Couch kickbacks for the Abstral prescriptions they wrote. Moreover, the Individual Defendants assisted in covering up these doctors' ownership of Galena stock by failing to disclose their ownership as the Company was required to disclose under the federal Sunshine Act. The Individual Defendants were complicit in these doctors' stock manipulation scheme and utilized the outsized revenues (resulting from the inflated Abstral prescriptions) to fund operations of the Company and used the overvalued stock to obtain equity financing. These actions would cause the Company to be subject to a federal securities class action lawsuit, damaging the Company.

109.   Following their convictions, the Department of Justice issued the following release describing Drs. Ruan and Couch's illegal kickback scheme with Galena involving Abstral:

**Dr. Couch and Dr. Ruan Sentenced to 240 and 252 Months In Federal Prison For Running Massive Pill Mill**

Acting United States Attorney Steve Butler of the Southern District of Alabama, announces that Dr. John Patrick Couch and Dr. Xiulu Ruan were sentenced to 240 months and 252 months, respectively, in federal prison for running a massive pill mill in Mobile, Alabama.

During the sentencing hearing today, Senior Judge Callie V.S. Granade found the doctors were responsible for illegally prescribing opioids, which when converted to their marijuana equivalency, exceeded 90,000 kilograms of marijuana.   In addition, she found that both doctors perjured themselves, and that they utilized special skills to carry out their criminal enterprise.   Thereafter, several family members of deceased Dr. Couch patients spoke to the Court, as did several patients on behalf of the doctor.   Ultimately, Judge Granade sentenced Dr. Couch to 240 months, and Dr. Ruan to 252 months, in federal prison.   Dr. Ruan received a longer sentence based on Judge Granade's finding that he was the leader of their criminal enterprise.   In addition, she ordered them to pay restitution in the

following amounts:   $6,282,023.00 to Medicare, $3,649,092.97 to Blue Cross/Blue Shield of Alabama, $2,285,170.70 to Tricare, and $1,695,929.00 to United Heath Group.

Prior to the execution of multiple search warrants by the FBI and DEA on May 20, 2015, Dr. Ruan and Dr. Couch jointly owned and operated two pain management clinics under the name Physicians Pain Specialists of Alabama ("PPSA") as well as C&R Pharmacy.  Following an extensive joint investigation by both FBI-Mobile and DEA-Mobile, both doctors were charged with a litany of federal felony offenses, including RICO conspiracy, conspiracy to violate the Controlled Substances Act, substantive drug distribution offenses, conspiracies to commit wire fraud, mail fraud, healthcare fraud, and to violate the Anti-Kickback Statute, as well as money laundering.  All charges stemmed from the defendants' operation of PPSA and C&R Pharmacy.

During the seven-week trial, which lasted from early January to late February, the United States presented evidence that Dr. Ruan and Dr. Couch utilized PPSA and C&R Pharmacy as a criminal enterprise to violate the Controlled Substances Act and to commit mail and wire fraud, in violation of the RICO Act.  Specifically, the jury saw evidence that the defendants knowingly and willfully prescribed Schedule II and III Controlled Substances, including fentanyl, outside the usual course of professional practice and not for a legitimate medical purpose.  The United States argued the defendants' motive for this illegal prescribing was their own financial self-interest.  The United States also argued that the defendants' billing practices were systematically designed to unlawfully enrich the doctors.

Of particular importance in the trial were two brand name instant-release fentanyl drugs — Subsys and Abstral.  Both Subsys and Abstral are only FDA-indicated for breakthrough cancer pain in opioid-tolerant adult patients.  However, evidence showed that Dr. Ruan and Dr. Couch almost exclusively prescribed these drugs off-label for neck, back, and joint pain.  The jury found that Dr. Ruan and Dr. Couch received illegal kickbacks from Insys Therapeutics, the manufacturer of Subsys, in exchange for the defendants prescribing massive quantities of this drug.  Dr. Ruan and Dr. Couch were both among the top prescribers of Subsys in the entire United States.  Evidence showed that Dr. Ruan began donating his Insys kickback payments the day after he received a copy of a criminal complaint from the Eastern District of Michigan against Dr. Gavin Awerbuch, another prolific Subsys prescriber who had been charged with receiving kickbacks from Insys. The United States argued that Dr. Ruan's decision to donate his Insys money was done in an attempt to distance himself from the company.

With regard to Abstral, evidence showed that Dr. Ruan and Dr. Couch purchased approximately $1.6 million worth of stock in Galena Biopharma, the manufacturer of Abstral, and sought to manipulate the stock price by driving up Abstral sales.  From the third quarter of 2013 through the 2014, Dr. Ruan and Dr. Couch were the number one and two prescribers of Abstral in the entire United

States.   During this same time period, nearly one out of every three Abstral prescriptions written in the U.S. were written by either Dr. Ruan or Dr. Couch.

As part of their criminal enterprise, Dr. Ruan and Dr. Couch owned C&R Pharmacy, which was co-located with one of the PPSA clinic locations.   C&R Pharmacy would only fill prescriptions written by the doctors at PPSA, and Dr. Ruan and Dr. Couch split 75% of the profits that came in from the prescription drug reimbursements.   Approximately 91% of the Subsys and Abstral prescriptions written by the defendants — which cost patients' insurance anywhere between $1,000.00 to $24,000.00 per month — were filled at C&R Pharmacy.

In addition to C&R Pharmacy, the defendants also had a worker's compensation dispensary, from which they directly dispensed Controlled Substances.   The jury heard evidence that Dr. Ruan and Dr. Couch received guaranteed monthly kickbacks from a dispensary management company — Industrial Pharmaceuticals Management ("IPM") and later Comprehensive Rx ("CRX") — in exchange for the defendants dispensing certain drugs with high reimbursement rates.   These monthly guaranteed amounts reached $80,000.00 per month for Dr. Ruan and $20,000.00 per month for Dr. Couch.   The millions paid in kickbacks to the defendants associated with the worker's compensation dispensary went into private bank accounts set up by the defendants.

While there were some patients who received legitimate medical care at PPSA, the jury heard evidence that many patients rarely saw either of the doctors, and that the nurse practitioners who treated Dr. Couch's patients were abusing drugs at the work place and then seeing patients.   In addition, the jury heard evidence that Dr. Couch knowingly permitted one of his nurse practitioners, Justin Palmer, to forge Dr. Couch's name on prescriptions for Controlled Substances.   Palmer testified that he forged Dr. Couch's name approximately 25,000 times while working at PPSA.

After seven-weeks of trial, 81 witnesses, and three days of deliberation, the jury reached the following verdicts:   Both doctors were convicted of (1) RICO conspiracy; (2) Conspiracy to prescribe Schedule II and III Controlled Substances outside the usual course of professional practice; (3) Conspiracy to prescribe more than 40 grams of fentanyl outside the usual course of professional practice; (4) Conspiracy to commit healthcare fraud; (5) Conspiracy to commit mail and wire fraud; (6) Conspiracy to receive illegal kickbacks from IPM/CRX related to the workers compensation dispensary; and (7) Conspiracy to receive illegal kickbacks from Insys Therapeutics in exchange for prescribing Subsys.   In addition, Dr. Ruan was convicted of both conspiracy and substantive money laundering counts. Each doctor was also convicted of several substantive illegal drug distribution counts related to prescriptions written to particular patients.   Dr. Ruan was acquitted of one substantive charge related to prescriptions written for a patient.

Following their convictions, the defendants agreed to forfeit to the United States several houses, beach condos, and bank accounts, as well as 23 luxury cars, including multiple Bentleys, Lamborghinis, Mercedes, and Ferraris. In addition to the forfeited property, each doctors agreed to an additional $5,000,000.00 money judgment. The United States is currently in the process of preparing to sell at auction the forfeited vehicles and property.

Prior to trial, Justin Palmer and Bridgette Parker, both nurse practitioners for Dr. Couch, pled guilty to conspiring to prescribe Controlled Substances outside the usual course of professional practice and not for a legitimate medical purpose. They have already been sentenced to federal prison for 30 months and 20 months, respectively. Christopher Manfuso, who worked for IPM and later owned CRX, pled guilty to conspiring to pay illegal kickbacks to the doctors. He has been sentenced to 6 months home confinement and a $50,000.00 fine. Finally, Insys Therapeutics drug rep Natalie Perhacs pled guilty to conspiring to pay illegal kickbacks associated with the prescribing of Subsys. Perhacs currently awaits sentencing. All four testified against the doctors at trial.

Acting United States Attorney Steve Butler said, "Any medical professional who chooses to place profit over patient care should heed the lengthy sentences received by Dr. Couch and Dr. Ruan. We commend the victims' family members who spoke so eloquently over the past two days about how the defendants' criminal conduct impacted, and continues to impact, their lives on a daily basis. Furthermore, thank you to our law enforcement partners at the FBI and DEA for their persistence in seeing that justice was done in this important case of national interest. Considering that opioid abuse and trafficking is of significant concern not only to us here in south Alabama, but nationwide, our office will continue to vigorously prosecute these cases."

"The DEA is committed to investigating and bringing to justice those who divert and traffic prescription drugs," said Special Agent in Charge Stephen G. Azzam of the Drug Enforcement Administration's New Orleans Field Office. "Opiate abuse is a major problem in Alabama and throughout the nation. The diversion of prescription pain killers contributes to the widespread abuse of opiates and is a gateway to heroin addiction, which is devastating our local communities. This investigation demonstrates the strength of collaborative law enforcement efforts in Alabama and our strong partnership with the U.S. Attorney's Office to aggressively pursue anyone who illicitly distributes these drugs. The lengthy sentences received by Dr. Ruan and Dr. Couch appropriately reflect the devastation they caused. These sentences will protect the community from these convicted felons and hopefully deter other medical practitioners who are inclined to put profit over patient health and safety," said Azzam.

FBI-Mobile Special Agent in Charge Robert Lasky stated, "The FBI is committed to the relationships with the law enforcement community that make these types of

investigations possible.  We will continue to target illegal activity in the medical profession as was apparent in this case."

This OCDETF case was jointly investigated by the DEA-Mobile and FBI-Mobile, and was prosecuted by Assistant U.S. Attorneys Christopher Bodnar and Deborah Griffin.[11]

### Galena Settles Department of Justice Probe of Abstral Kickback Scheme

110.    On Friday, September 8, 2017, the Department of Justice announced that it had agreed to settle claims under civil False Claims Act that Galena had paid kickbacks to doctors to induce them to prescribe Abstral. The DOJ characterized Galena's conduct as "egregious" and confirmed that Galena paid multiple types of kickbacks to induce doctors to prescribe Abstral, including providing more than 85 free meals to doctors and staff from a single, high-prescribing practice; paying doctors $5,000, and speakers $6,000, plus expenses, to attend an "advisory board" that was partly planned, and attended, by Galena sales team members and paying approximately $92,000 to a physician-owned pharmacy under a performance-based rebate agreement to induce the owners to prescribe Abstral. The full release by the Department of Justice is produced herein below:

**Galena Biopharma Inc. to Pay More Than $7.55 Million to Resolve Alleged False Claims Related to Opioid Drug**

Galena Biopharma Inc. (Galena) will pay more than $7.55 million to resolve allegations under the civil False Claims Act that it paid kickbacks to doctors to induce them to prescribe its fentanyl-based drug Abstral, the Department of Justice announced today.

"Given the dangers associated with opioids such as Abstral, it is imperative that prescriptions be based on a patient's medical need rather than a doctor's financial interests," said Acting Assistant Attorney General Chad A. Readler of the Justice Department's Civil Division. "The Department of Justice intends to vigorously pursue those who offer and receive illegal inducements that undermine the integrity of government health care programs."

---

[11]    Available: https://www.justice.gov/usao-sdal/pr/dr-couch-and-dr-ruan-sentenced-240-and-252-months-federal-prison-running-massive-pill

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

"The conduct alleged by the government and resolved by today's settlement was egregious because it incentivized doctors to over-prescribe highly addictive opioids," said Acting U.S. Attorney William E. Fitzpatrick for the District of New Jersey. "This settlement constitutes another example of the Department of Justice's ongoing efforts to battle the opioid epidemic on every front."

The United States contends that Galena paid multiple types of kickbacks to induce doctors to prescribe Abstral, including providing more than 85 free meals to doctors and staff from a single, high-prescribing practice; paying doctors $5,000, and speakers $6,000, plus expenses, to attend an "advisory board" that was partly planned, and attended, by Galena sales team members and paying approximately $92,000 to a physician-owned pharmacy under a performance-based rebate agreement to induce the owners to prescribe Abstral. The United States also contends that Galena paid doctors to refer patients to the company's RELIEF patient registry study, which was nominally designed to collect data on patient experiences with Abstral, but acted as a means to induce the doctors to prescribe Abstral. Galena has not marketed any pharmaceutical drug since the end of 2015.

Two of the doctors who received remuneration from Galena were tried, convicted and later sentenced to prison in the U.S. District Court for the Southern District of Alabama following a jury trial of, among other counts, offenses relating to their prescriptions of Abstral. Galena cooperated in that prosecution.

The settlement resolves a lawsuit filed by relator Lynne Dougherty under the whistleblower provisions of the False Claims Act, which permit private parties to file suit on behalf of the United States and obtain a portion of the government's recovery. As part of today's resolution, Ms. Dougherty will receive more than $1.2 million. The matter remains under seal as to allegations against entities other than Galena.

The settlement is the result of a coordinated effort by the Civil Division's Commercial Litigation Branch and the U.S. Attorney's Office for the District of New Jersey, with assistance from the Department of Health and Human Services Office of Counsel to the Inspector General, and the Food and Drug Administration Office of Criminal Investigations' Metro Washington Field Office.

The claims settled by this agreement are allegations only; there have been no admissions of liability by Galena.[12]

---

[12]     Available: https://www.justice.gov/opa/pr/galena-biopharma-inc-pay-more-755-million-resolve-alleged-false-claims-related-opioid-drug

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Galena Merges with Sellas Life Sciences**

111.   In March 2017, Galena announced that it had hired Canaccord Genuity to help develop a plan to sell the Company or its assets. A press release stated that they were exploring a range of alternatives, including "a sale of the company, a business combination, a merger or reverse merger with another party, continuing to advance the clinical programs as a stand-alone entity, and a license or other disposition of corporate assets of the Company." This announcement came approximately five weeks after defendant Schwartz resigned over the civil and criminal investigation by federal investigators into Abstral (as discussed herein).

112.   In short, the public (and the acquiring company, Sellas) was fully aware that the government was investigating Galena regarding Abstral. Likewise, everyone was also fully aware that Galena had lost its last two CEOs–Schwartz and Mark Ahn–over improprieties. Sellas (and its Board of Directors) were necessarily given full access to Galena's books and records as a part of their due diligence into the purchase of the Company. ███████████████████ ████████████████████████████████████████████ ███████████████████████████

113.   Sellas bid on Galena and the Company would go on to announce "a thorough review of available alternatives, and extensive diligence and negotiation with Sellas, Galena's Board unanimously approved to enter into a definitive merger agreement with Sellas." Under the terms of the merger agreement, existing Sellas shareholders would receive newly-issued shares of Galena common stock. On a pro forma basis, assuming completion of the proposed merger, Galena stock and warrant holders would own approximately 32.5%, and Sellas shareholders would own about 67.5% of the combined company. The Merger closed, effective Dec. 29 2017.

114.   While the pre-merger Galena Board did not receive any direct monetary compensation in connection with the Merger, they received something even more valuable from Sellas Life Sciences Group Ltd. ("Sellas") and the Sellas directors (who would go on to become the Post-Merger Galena Board). The Company's Form S-4 explicitly provides that the pre-

Merger Galena Board members and the post-Merger Sellas/Galena Board members would "jointly and severally, indemnify and hold harmless" each for ***any and all claims relating to their service as directors of Galena***. The full language in the S-4 is reproduced below:

### Indemnification and Insurance for the Galena and SELLAS Officers and Directors

Under the Merger Agreement, from the effective time of the Merger through the sixth anniversary of the date on which the effective time of the Merger occurs, each of Galena and SELLAS shall, jointly and severally, indemnify and hold harmless each person that was as of August 7, 2017, or has been at any time prior to August 7, 2017, or who becomes prior to the effective time of the Merger, a director or officer of Galena or Sellas, which are referred to herein as the D&O Indemnified Parties, against all claims, losses, liabilities, damages, judgments, fines and reasonable fees, costs and expenses, including attorneys' fees and disbursements, incurred in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, arising out of or pertaining to the fact that the D&O Indemnified Party is or was a director or officer of Galena or SELLAS, whether asserted or claimed prior to, at or after the effective time of the Merger, to the fullest extent permitted under the DGCL for directors or officers of Delaware corporations and in the case of SELLAS to the fullest extent permitted under the Companies Act.

* * *

### Indemnification and Insurance for the SELLAS Officers and Directors
See "The Merger—Interests of the Galena Directors and Executive Officers in the Merger—Indemnification and Insurance for the Galena and SELLAS Officers and Directors."

In addition to the indemnification required in the Merger Agreement, SELLAS expects that the continuing company will enter into indemnification agreements with each of its directors and executive officers. These agreements are expected to provide for the indemnification of the directors and executive officers of the continuing company for all reasonable expenses and liabilities incurred in connection with any action or proceeding brought against them by reason of the fact that they are or were agents of the continuing company.

115.   This indemnification agreement was not limited to claims arising out of the Merger itself, but by its terms is unlimited and would apply to claims relating to the pre-Merger Board's illegal conduct relating to Abstral. The pre-Merger Board violated their fiduciary duties

by negotiating and obtaining a de facto release for their illegal behavior and breaches of fiduciary duties. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ This release would also have insulated these pre-Merger Board members from liability in the related Class Action lawsuit filed against Galena pending in the U.S. District Court for the District of New Jersey. In short, via the Merger, the pre-Merger Board members insulated themselves from all liability to the Company. This violated both the pre and post-Merger Board's fiduciary duties to Galena.

## DERIVATIVE AND DEMAND ALLEGATIONS

116.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

117.    Plaintiff is the owner of Galena common stock and was an owner of Galena common stock at all times relevant hereto and has continuously owned Galena stock since December 20, 2013.

118.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

119.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Galena Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

120.    At the time this action was commenced, the Board consisted of seven directors: defendants Wasman, Lopez, Ghiglieri, Scheinberg, Nostrand, Varian and Stergiou. Plaintiff alleges that all seven of the directors had actual knowledge of the illegal Abstral kickback/rebate scheme described herein. Given that a majority of the Board was not

disinterested or lacked independence with respect to the subject of this suit, accordingly, Plaintiff did not make any demand on the Board to institute this action because such a demand would have been futile, wasteful, and a useless act.

121.   Plaintiff realleges each allegation above as if it had been reproduced here in his allegations supporting futility of demand.

122.   █████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████

123.   ██████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████

124.   ██████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
█████████████████

125.   The sworn statements and evidence presented in the criminal trial of Drs. Couch and Ruan confirms that the Company's most senior executives (██████████████
██████████████████████████████████████████████████████████████████)

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

deliberately courted Drs. Couch and Ruan and were well aware of their illegal pill mill, yet nevertheless continued to do business with them.

126.    Sellas (and the post-Merger directors) was provided with access to the Company's books and records prior to consummating the Merger, including the Board materials cited herein. ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████  This act was not made to protect the Company, but rather to protect themselves. Directors of public companies are not permitted to place their own interests ahead of the Company's interests, and both the pre- and post-Merger Board did this, to the detriment of the Company.

127.    These Board members cannot independently and disinterestedly consider a demand.

128.    Each of the Individual Defendants faces a substantial risk of liability for their role in and oversight of the illegal kickback scheme and/or their decision to insulate the culpable parties as described herein. In particular, because the indemnification agreement imposes joint and several liability, each current Board member has a personal financial interest in not bringing suit against the pre-Merger directors who harmed the Company because they would each be jointly and severally liable for the damages. No rational person would make such a decision to harm themselves financially.

129.    In addition, the Company's own public filings admit that defendants Stergiou, Lopez and Ghiglieri are not independent or disinterested. Defendant Ghiglieri currently serves as interim Chief Executive Officer, for which he receives substantial compensation, making him not independent. Ghiglieri was also on both sides of the indemnification agreement – as both a pre- and post-Merger director.

130. Defendants Stergiou and Lopez were Sellas directors and collectively owned more than 73% of Sellas' stock (Stergiou – 13.9%; Lopez – 59.31%). These two directors exercised actual domination and control over Sellas and the other three Sellas appointees ("Following the Merger, none of the current Galena directors will serve as directors of the continuing company and the continuing company's directors will consist of seven members, with five designated by SELLAS, including Dr. Stergiou, Fabio López, and three additional directors appointed by SELLAS"). The Company's most recent Proxy Statement on Form DEF 14A, filed April 6, 2018, confirms that the Company is a continues to be a controlled company by defendants Stergiou and Lopez. Lopez owns 50.4% of the Company's outstanding stock and Stergiou owns another 7.4% of the Company's outstanding stock. This alone makes demand futile for the entire Board given these directors exercise complete authority over the appointment of all directors to the Company's Board. In addition, given defendants Stergiou and Lopez's ownership interests and their unquestioned ability to select the "three additional directors" per the Company's SEC filings, they exercise domination and control over a majority of the Board. Stergiou and Lopez also entered into the indemnification agreements which also benefit themselves with the pre-Merger Board, excusing demand.[13]

131. Defendant Scheinberg also lacks independence from interested parties and/or is not disinterested given his position on Sellas' Scientific Advisory Board since 2015. Scheinberg's role as in a senior position with Sellas prior to the Merger (and during the indemnification agreement) excuses demand.

---

[13] Stergiou is also listed as President and Chief Executive Officer of the Company – a role which also excuses demand.

## COUNT I
## Against All Individual Defendants for Breach of Fiduciary Duty

132.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.   Each of the Individual Defendants had actual or constructive knowledge of the misconduct alleged herein and/or directed Galena to engage in an illegal kickback scheme in the sales and marketing of Abstral.

134.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Galena has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II
## Against  All Individual Defendants  for Unjust Enrichment

135.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136.   By their wrongful acts, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Galena and it would be unconscionable to allow them to retain the benefits of their illegal conduct. The Individual Defendants were unjustly enriched by their receipt of compensation (as directors and/or as executives of Galena) while knowingly causing Galena to engage in illegal behavior regarding the sales and marketing of Abstral.

137.   Plaintiff, as a shareholder of Galena, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all proceeds obtained by the Individual Defendants, and each of them, as a result of their wrongful conduct and breaches of fiduciary duty.

138.   As a result of Defendants' unjust enrichment, Galena has been injured and is entitled to damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.   Imposing a constructive trust in favor of the Company for the amount of proceeds each of the Individual Defendants received from Galena;

C.   Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

D.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

139.   Plaintiff hereby demands a trial by jury for all claims triable to a jury.

Dated: June 20, 2018                    By:   *s/ Kip B. Shuman*
                                         Kip B. Shuman (CA State Bar #: 145842)
                                         THE SHUMAN LAW FIRM
                                         1 Montgomery Street, #1800
                                         San Francisco, CA 94104
                                         Telephone (303) 861-3003
                                         Facsimile (303) 536-7849

                                         Rusty E. Glenn
                                         THE SHUMAN LAW FIRM
                                         600 17th Street, Suite 2800 South
                                         Denver, CO 80202
                                         Telephone: (303) 861-3003
                                         Facsimile: (303) 536-7849

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

_____

*Counsel for Plaintiff*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Galena Biopharma, Inc. Verification**

I, Albert Zhang, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint and that I have authorized the filing of the Shareholder Derivative Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: 06/21/18

Albert Zhang